On Remand from the Alabama Supreme Court
The appellant, Navada Dewayne Smith, was convicted of trafficking in cocaine, a *Page 93 
violation of § 13A-12-231(2)a., Ala. Code 1975, and failure to affix tax stamps, a violation of § 40-17A-4, Ala. Code 1975. The trial court sentenced him to serve concurrent terms of ten years in prison on the trafficking conviction and one year in prison on the failure to affix conviction. It then split the sentence on the trafficking conviction and ordered the appellant to serve three years in prison followed by three years on probation. We affirmed the appellant's convictions in an unpublished memorandum, see Smith v. State, (CR-99-1519, September 29, 2000) 814 So.2d 1019 (Ala.Crim.App. 2000) (table); remanded the case for resentencing on the failure to affix conviction, see Smith v. State,832 So.2d 86 (Ala.Crim.App. 2000); and affirmed the sentence on return to remand in an unpublished memorandum, see Smith v. State, (CR-99-1519, February 9, 2001) ___ So.2d ___ (Ala.Crim.App. 2000) (table). On September 14, 2001, the Alabama Supreme Court reversed our judgment and remanded the case with instructions that this court "address the merits of the issue [the appellant] raised concerning the admission of the officer's testimony about [the appellant's] statement." Ex parte Smith,832 So.2d 89, 91 (Ala. 2001).
The evidence showed that, on June 19, 1997, law enforcement officers from the Jefferson County Sheriff's Department were observing a residence at which they suspected drug activity was occurring. They followed the appellant from the residence to a gas station, where he got into a vehicle driven by Quinshay Jones. The appellant and Jones then drove to a restaurant parking lot. Jones, who was carrying a brown paper bag, got out of the vehicle and walked to a confidential informant's vehicle. After Jones got into the informant's vehicle, law enforcement officers arrested him and confiscated the brown paper bag he had been carrying. Subsequent forensic testing revealed that the bag contained 99.81 grams of cocaine. Officers also arrested the appellant, who was still sitting in the vehicle Jones had been driving, but they did not find any cocaine on him or in the vehicle. However, in a statement he later made to law enforcement officers, the appellant admitted that he had received the cocaine from someone named Jason Kirshner and had then supplied the cocaine to Quinshay Jones.
The appellant argues that, because the State allegedly did not establish a proper Miranda[1] predicate, the trial court improperly admitted into evidence the statement he made to law enforcement officers. Specifically, he contends that the State did not "provide sufficient evidence that [he] was advised of and understood his Miranda
rights prior to giving the statement." (Appellant's brief at p. 19.)
At trial, Deputy Kirk McEwin of the Jefferson County Sheriff's Department testified about the arrest and questioning of the appellant. During his testimony, the following occurred:
"[PROSECUTOR:] Did you talk to [the appellant]?
"[McEWIN]: Yes, I did.
 "[PROSECUTOR]: At some point did you read him his Miranda Warning?
"[McEWIN]: Yes, I did.
 "[PROSECUTOR]: Did you tell him he had a right to a lawyer?
"[McEWIN]: Correct.
 "[PROSECUTOR]: Did you tell him he had a right to remain silent?
"[McEWIN]: Correct. *Page 94 
 "[PROSECUTOR]: Did he say he was willing to talk to you?
"[McEWIN]: Yes.
"[PROSECUTOR]: Did he ask for a lawyer?
"[McEWIN]: Yes, he did.
 "[PROSECUTOR]: What did you do in response to him asking for a lawyer?
 "[McEWIN]: He said that he want[ed] to call his attorney, Paul Phillips. And so I called him. Mr. Phillips came down to the office, spoke with [the appellant], and I then spoke with [the appellant] in the presence of Mr. Phillips.
"[PROSECUTOR]: Did [the appellant] give a statement?
"[McEWIN]: Yes, he did.
"[PROSECUTOR]: What was that?
". . . .
 "[McEWIN]: He stated to me that he got the cocaine from an individual by the name of Jason Kirshner and then he supplied it to Quinshay Jones.
"[PROSECUTOR]: Was that all the statement?
"[McEWIN]: Yes.
". . . .
"[PROSECUTOR]: Who else was present?
"[McEWIN]: Deputy Tommy Bridges.
"[PROSECUTOR]: Was the lawyer still there?
"[McEWIN]: Yes.
"[PROSECUTOR]: Was he inside of the conversation, also?
"[McEWIN]: Yes, he was.
 "[PROSECUTOR]: Did he have anything to say about all of this?
"[McEWIN]: Pardon?
"[PROSECUTOR]: Did he say anything during this?
 "[McEWIN]: I don't recall any specific things that he said, no."
(R. 77-79.) During the State's re-direct examination of McEwin, the following occurred:
 "[PROSECUTOR]: At what point did you read him his Miranda warning?
 "[McEWIN]: When I began — was going to question him and talk to him about the events that occurred.
". . . .
 "[PROSECUTOR]: And when you get down to business, you read him his Miranda rights?
"[McEWIN]: Correct.
 "[PROSECUTOR]: After you read him his Miranda warning, is that when he immediately — did he immediately ask for his lawyer?
 "[McEWIN]: He said — well, he said he didn't want to say anything, he wanted to talk to his attorney, and he said it's Mr. Phillips, and then I said, `Okay,' and I said, `Is he a criminal attorney?' And he think he was representing [the appellant] on an injury at a place of employment.
"[PROSECUTOR]: A Workman's Comp claim?
"[McEWIN]: Correct.
"[PROSECUTOR]: So did you stop at that point?
 "[McEWIN]: Correct. Stopped, said, `Fine, we'll call him,' and then we just waited.
 "[PROSECUTOR]: When Mr. Phillips came down, did you give them an opportunity to talk in private?
"[McEWIN]: Yes.
 "[PROSECUTOR]: Did they initiate the next part of the conversation or did you? Or do you remember?
 "[McEWIN]: Well, Mr. Phillips, best I remember, he came out of the office *Page 95 
and said, `Y'all come on back in.' We walked in and he told me he wanted him to — you know, cooperate and tell us what happened, and he gave us the name of a guy who we have investigated before — actually, I have arrested before — as his supplier. We didn't think he was being truthful, because we knew that he had gone to another location."
(R. 98-99.)
Paul Phillips also testified about the circumstances surrounding the interrogation. He stated that, after he and the appellant discussed the matter privately, he told the officers the appellant wanted to cooperate. He added that the appellant "cooperated as much as he could." (R. 111.) However, he contended that the appellant "did not say he received cocaine from anyone." (R. 111.)
The appellant concedes that, in attempting to establish a predicate for the admission of the statement, the State did more than ask generally whether McEwin had advised the appellant of his Miranda rights — a practice that was condemned in Swicegood v. State, 50 Ala. App. 105,277 So.2d 380 (Ala.Crim.App. 1973), and Ex parte Johnson, 620 So.2d 709
(Ala.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235
(1993). Nevertheless, citing Ex parte Price, 725 So.2d 1063 (Ala. 1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999), he contends that the State's evidence was "still not sufficiently detailed to satisfy the requirements of a Miranda predicate." (Appellant's brief at pp. 20-21.)
In Miranda v. Arizona, 384 U.S. 436, 444-45, 86 S.Ct. 1602, 1612,16 L.Ed.2d 694 (1966), the United States Supreme Court stated:
 "Our holding will be spelled out with some specificity in the pages which follow but briefly stated it is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. . . .
". . . .
 "The constitutional issue we decide in each of these cases is the admissibility of statements obtained from a defendant questioned while in custody or otherwise deprived of his freedom of action in any significant way. In each, the defendant was questioned by police officers, detectives, or a prosecuting attorney in a room in which he was cut off from the outside world. In none of these cases was the defendant given a full and effective warning of his rights at the outset of the interrogation process. In all the cases, the questioning elicited oral admissions, and in three of them, signed statements as well which were admitted at their trials. They all thus share salient features — incommunicado interrogation of individuals in a police-dominated atmosphere, resulting *Page 96 
in self-incriminating statements without full warnings of constitutional rights."
(Footnote omitted; emphasis added.) Subsequently, the Supreme Court explained:
 "A different phase of the Escobedo decision was significant in its attention to the absence of counsel during the questioning. There, as in the cases today, we sought a protective device to dispel the compelling atmosphere of the interrogation. In Escobedo, however, the police did not relieve the defendant of the anxieties which they had created in the interrogation rooms. Rather, they denied his request for the assistance of counsel, 378 U.S., at 481, 488, 491, 84 S.Ct. at 1760, 1763, 1765. This heightened his dilemma, and made his later statements the product of this compulsion. Cf. Haynes v. State of Washington, 373 U.S. 503, 514, 83 S.Ct. 1336, 1343 (1963). The denial of the defendant's request for his attorney thus undermined his ability to exercise the privilege — to remain silent if he chose or to speak without any intimidation, blatant or subtle. The presence of counsel, in all the cases before us today, would be the adequate protective device necessary to make the process of police interrogation conform to the dictates of the privilege. His presence would insure that statements made in the government-established atmosphere are not the product of compulsion.
 "It was in this manner that Escobedo explicated another facet of the pre-trial privilege, noted in many of the Court's prior decisions: the protection of rights at trial. That counsel is present when statements are taken from an individual during interrogation obviously enhances the integrity of the fact-finding processes in court. The presence of an attorney, and the warnings delivered to the individual, enable the defendant under otherwise compelling circumstances to tell his story without fear, effectively, and in a way that eliminates the evils in the interrogation process. Without the protections flowing from adequate warning and the rights of counsel, `all the careful safeguards erected around the giving of testimony, whether by an accused or any other witness, would become empty formalities in a procedure where the most compelling possible evidence of guilt, a confession, would have already been obtained at the unsupervised pleasure of the police.' Mapp v. Ohio, 367 U.S. 643, 685, 81 S.Ct. 1684, 1707, 6 L.Ed.2d 1081 (1961) (Harlan, J., dissenting). Cf. Pointer v. State of Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).
". . . .
 "Today, then, there can be no doubt that the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves. We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.
 "It is impossible for us to foresee the potential alternatives for protecting the privilege which might be devised by Congress or the States in the exercise of *Page 97 their creative rule-making capacities. Therefore we cannot say that the Constitution necessarily requires adherence to any particular solution for the inherent compulsions of the interrogation process as it is presently conducted. Our decision in no way creates a constitutional straitjacket which will handicap sound efforts at reform, nor is it intended to have this effect. We encourage Congress and the States to continue their laudable search for increasingly effective ways of protecting the rights of the individual while promoting efficient enforcement of our criminal laws. However, unless we are shown other procedures which are at least as effective in apprising accused persons of their right of silence and in assuring a continuous opportunity to exercise it, the following safeguards must be observed.
 "At the outset, if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent. For those unaware of the privilege, the warning is needed simply to make them aware of it — the threshold requirement for an intelligent decision as to its exercise. More important, such a warning is an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere. It is not just the subnormal or woefully ignorant who succumb to an interrogator's imprecations, whether implied or expressly stated, that the interrogation will continue until a confession is obtained or that silence in the face of accusation is itself damning and will bode ill when presented to a jury. Further, the warning will show the individual that his interrogators are prepared to recognize his privilege should he choose to exercise it.
 "The Fifth Amendment privilege is so fundamental to our system of constitutional rule and the expedient of giving an adequate warning as to the availability of the privilege so simple, we will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given. Assessments of the knowledge the defendant possessed, based on information as to his age, education, intelligence, or prior contact with authorities, can never be more than speculation; a warning is a clearcut fact. More important, whatever the background of the person interrogated, a warning at the time of the interrogation is indispensable to overcome its pressures and to insure that the individual knows he is free to exercise the privilege at that point in time.
 "The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court. This warning is needed in order to make him aware not only of the privilege, but also of the consequences of forgoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege. Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system — that he is not in the presence of persons acting solely in his interest.
 "The circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators. Therefore, the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today. Our aim is to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process. A once-stated warning, *Page 98 
delivered by those who will conduct the interrogation, cannot itself suffice to that end among those who most require knowledge of their rights. A mere warning given by the interrogators is not alone sufficient to accomplish that end. Prosecutors themselves claim that the admonishment of the right to remain silent without more `will benefit only the recidivist and the professional.' Brief for the National District Attorneys Association as amicus curiae, p. 14. Even preliminary advice given to the accused by his own attorney can be swiftly overcome by the secret interrogation process. Cf. Escobedo v. State of Illinois, 378 U.S. 478, 485, n. 5, 84 S.Ct. 1758, 1762. Thus, the need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning if the defendant so desires.
 "The presence of counsel at the interrogation may serve several significant subsidiary functions as well. If the accused decides to talk to his interrogators, the assistance of counsel can mitigate the dangers of untrustworthiness. With a lawyer present the likelihood that the police will practice coercion is reduced, and if coercion is nevertheless exercised the lawyer can testify to it in court. The presence of a lawyer can also help to guarantee that the accused gives a fully accurate statement to the police and that the statement is rightly reported by the prosecution at trial. See Crooker v. State of California, 357 U.S. 433, 443-448, 78 S.Ct. 1287, 1293-1296, 2 L.Ed.2d 1448 (1958) (Douglas, J., dissenting)."
384 U.S. at 465-70, 86 S.Ct. at 1623-26 (footnotes omitted; emphasis added). Finally, the Supreme Court held:
 "The warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant."
384 U.S. at 476, 86 S.Ct. at 1629 (emphasis added).
Under the unique facts of this case, we conclude that it was not necessary for the State to establish that McEwin advised the appellant of his rights in the form set forth in Miranda because "other fully effective means" were used to assure that the appellant's rights were protected. In particular, we note that the appellant invoked his right to remain silent; that he requested that he be allowed to speak to an attorney, whose name he provided to the officers; that the officers immediately stopped talking to the appellant and contacted the attorney he had requested; that he subsequently spoke to that attorney privately; and that he spoke to law enforcement officers, with his attorney present and based on his attorney's recommendation, only after he and his attorney reinitiated contact with the officers. The appellant clearly understood and exercised his rights to remain silent and to consult with an attorney. He also understood and exercised his right to have his attorney present during any interrogation. Therefore, the Miranda court's concerns about "incommunicado interrogation of individuals in a police-dominated atmosphere" are not implicated in this case. Because the appellant clearly understood and exercised his rights to remain silent and to consult with an attorney, we conclude that "other fully effective means" that constituted "a fully effective equivalent" of the Miranda
warnings were present.
Miranda was concerned with protecting the Fifth Amendment privilege against *Page 99 
self-incrimination and the Sixth Amendment right to counsel. In this case, McEwin specifically advised the appellant of his right to remain silent, and the appellant initially exercised that right. Thereafter, when he spoke to the officers about the offense, the attorney he had requested was present and had actually recommended that he cooperate with the law enforcement officers. Therefore, the appellant's Fifth Amendment privilege against self-incrimination was protected in this case.
Furthermore, after he invoked his right to remain silent, the appellant requested that he be allowed to speak with an attorney; he named the attorney with whom he wanted to speak; he spoke privately with that attorney; and he reinitiated contact with the officers in the presence of and at the recommendation of that attorney. In Commonwealth v.Cunningham, 471 Pa. 577, 584, 370 A.2d 1172, 1175 (1977), the Pennsylvania Supreme Court addressed a situation in which the suspect had an attorney present during an interrogation as follows:
 "Appellant asserts that the signed statement which was introduced against him was involuntarily given and thus should have been suppressed. This statement was obtained during a counseled interview. . . .
 ". . . [T]he parents of appellant obtained counsel who met and conferred with appellant. Thereafter, a counseled interview took place during which the statement, which is now challenged, was prepared and signed.
 "At the outset of our consideration of appellant's challenge to this statement it must be noted that since counsel was present and appellant was provided a full opportunity to confer with him, it is obvious that the Sixth Amendment right to counsel has been satisfied."
Similarly, because the appellant had an opportunity to confer with an attorney and had that attorney present with him when he spoke to law enforcement officers, we conclude that his Sixth Amendment right to counsel was protected in this case.
We note that the cases upon which the appellant relies, including Exparte Price, are distinguishable from this case. Unlike the defendants in those cases, the appellant in this case consulted with an attorney and had an attorney present when he spoke to law enforcement officials. Also, unlike those cases, there were "other fully effective means," as set forth previously, of protecting the appellant's Fifth and Sixth Amendment rights in this case. Therefore, the appellant's reliance on Exparte Price and several other cases he cites in his brief is misplaced.
Because "other fully effective means" of protecting the appellant's Fifth and Sixth Amendment rights were present, it was not necessary for the State to establish that McEwin specifically advised the appellant of the rights in the form set forth in Miranda for the appellant's statement to be admissible. Therefore, the appellant's argument that the trial court improperly admitted his statement into evidence is without merit.
For the reasons stated herein and in our previous memoranda, we affirm the trial court's judgment.
AFFIRMED.
McMillan, P.J., and Cobb, Shaw, and Wise, JJ., concur.
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694
(1966). *Page 100