## Commonwealth *vs.* Wally Jacques Simon.

Middlesex. November 2, 2009. - March 12, 2010.

Present: Marshall, C.J., Ireland, Spina, Cowin, Cordy, Botsford, & Gants, JJ.

*Constitutional Law,* Admissions and confessions, Waiver of constitutional rights, Confrontation of witnesses. *Practice, Criminal,* Admissions and confessions, Motion to suppress, Confrontation of witnesses, Motion in limine. *Evidence,* Admissions and confessions, Testimonial statement, Spontaneous utterance.

A Superior Court judge hearing a criminal defendant's pretrial motion to suppress statements he made during police questioning that took place at his attorney's office correctly concluded that the defendant was in custody, where, in the circumstances, a reasonable person in the defendant's position would not have believed he was free to leave, and where the defendant was arrested at the end of the interview. [285-288]

A Superior Court judge properly denied a criminal defendant's pretrial motion to suppress statements he made during police questioning while in custody, without having been given Miranda warnings, where the presence of his attorney during questioning, when combined with the opportunity to consult with the attorney beforehand, adequately substituted for Miranda warnings to safeguard the right against self-incrimination under the Fifth Amendment to the United States Constitution; and where the presence of his attorney during questioning and the opportunity to consult with the attorney beforehand sufficed to protect his right against self-incrimination secured by art. 12 of the Declaration of Rights of the Massachusetts Constitution, in that the omission of Miranda warnings in these circumstances conferred no advantage on the police. [288-295] Botsford, J., dissenting, with whom Marshall, C.J., and Spina, J., joined.

A Superior Court judge did not abuse his discretion in denying a criminal defendant's pretrial motion to exclude from evidence certain statements made by a shooting victim, who was unavailable to testify (due to his death from unrelated causes prior to trial), in response to questions asked by a 911 dispatcher during a telephone call immediately after he and his brother had been shot, in which the victim identified the nature of the emergency and described the shooter, where the victim's statements were admissible under the spontaneous utterance exception to the hearsay rule, and where the statements were not testimonial per se [295-300]; however, the judge erred in denying the motion with respect to other statements that described the shooting itself in detail, and statements that informed the dispatcher that the assailant "worked out" at a certain gym, where those statements, which would not have helped resolve the ongoing emergency or secure the crime scene, were testimonial per se and were therefore inadmissible under the confrontation clause of the Sixth Amendment to the United States Constitution [300-301].

INDICTMENTS found and returned in the Superior Court Department on December 13, 2007.

A pretrial motion to suppress evidence was heard by *Hiller B. Zobel,* J., and an order denying a motion to exclude testimonial hearsay was reported by him to the Appeals Court.

An application for leave to prosecute an interlocutory appeal of the pretrial motion to suppress evidence was allowed by *Cowin,* J., in the Supreme Judicial Court for the county of Suffolk. The Supreme Judicial Court on its own initiative transferred the reported order from the Appeals Court.

*Aviva E. Jeruchim* for the defendant.

*Marian T. Ryan,* Assistant District Attorney *(Fawn D. Balliro Andersen,* Assistant District Attorney, with her) for the Commonwealth.

*David H. Mirsky,* for Committee for Public Counsel Services, amicus curiae, submitted a brief.

COWIN, J. In this interlocutory appeal, we determine that the presence of counsel during police questioning of a suspect, when the suspect has had an opportunity to consult with counsel beforehand, substitutes adequately for the giving of Miranda warnings, see *Miranda* v. *Arizona,* 384 U.S. 436, 444 (1966) *(Miranda).* We affirm the Superior Court judge's decision denying the defendant's motion to suppress statements he made during such questioning. In addition, since most of the statements made by the victim during an emergency call to a 911 dispatcher were made to obtain urgent medical attention and, therefore, were nontestimonial, we affirm the denial of the defendant's motion in limine with respect to those statements. However, we conclude that *certain statements in response to the dispatcher's inquiries were testimonial, and order those portions redacted.*

1. *Background and prior proceedings.* We recite the facts found by the Superior Court judge following evidentiary hearings on both the defendant's motion to suppress statements and motion in limine to exclude testimonial hearsay,[1] supplemented by other undisputed evidence in the record, and reserving some facts for later discussion. Although the parties dispute the judge's legal conclusions, the content of the victim's 911 telephone call

---

[1]The same judge ruled separately on both motions.

and the essential facts concerning the questioning of the defendant in his attorney's office are not disputed.

In the early morning of October 24, 2007, police responded to the scene of a shooting of two brothers in their home in Winchester; police had been notified of the home invasion by an emergency 911 cellular telephone call by one of the victims, Bryan Barbaro. The caller stated that he had been robbed; that he and his brother had been shot; that his brother was on the ground and not breathing well; and that he himself was bleeding profusely. The caller was able to provide his full name and address; he repeatedly urged that emergency responders should go to the second floor to treat his brother first before attempting to reach him on the third floor, and at one point exclaimed that his brother might already have died. At some points, the caller recounted the events of the shooting calmly, while at other times he was clearly in dire distress and on the verge of losing consciousness. When police arrived at the address, they found the brother unconscious on the second floor of the house, and the caller, who had been shot in the chest, on the third floor. The brother, Christopher Barbaro, died; the caller was seriously wounded but survived.[2]

During his conversation with the emergency dispatcher, the caller stated that he recognized his assailant. The caller provided the dispatcher with the assailant's first name (Wally), a physical description, and a description of the assailant's car; he stated also that the assailant worked out at Mike's Gym and that police could obtain further information, including the assailant's last name, by contacting staff at that gym.

Police learned from the victim's relatives that the victim was a member of the Mike's Gym located in Medford. The police were informed by staff at that gym that the defendant, one of two members named Wally, matched the description given during the 911 telephone call. They obtained the defendant's address and motor vehicle registration, located his vehicle, and undertook surveillance of it in unmarked cars. Nevertheless, based on the fact that the defendant abruptly changed direction several times, the police believed, as the judge found, that the defendant was aware that he was being followed. Six or seven

---

[2]Bryan Barbaro died of unrelated causes approximately nine months after these events and before the hearings in this case.

police officers followed the defendant from Medford to a parking lot in Boston, where the defendant got out of his vehicle while talking on his cellular telephone. The parking lot was across the street from a commercial building in which the defendant's attorney maintains an office.

Trooper Michael Banks of the State police approached the defendant, stated that he wanted to talk to him, and pat frisked him; the other officers stood nearby on the sidewalk. The defendant responded that he was speaking with his attorney on his cellular telephone and did not want to talk to police until his attorney came downstairs. A few minutes later, attorney Daniel Solomon approached the group. Banks, who knew Solomon, said that the police wanted to question his client about an "incident in Winchester." Solomon informed Banks that he and the defendant would go up to his office, and that Solomon would then notify the police whether the defendant would speak with them. Banks gave Solomon his cellular telephone number, and Solomon and the defendant went into the building.

The officers waited nearby in a location from which they could observe the entrance to the office building. Forty-five minutes to an hour later, Banks received a telephone call from investigators who had spoken with the surviving victim at the hospital; Banks was informed that the surviving victim had identified the defendant as the shooter. As two police officers, Trooper Scott McCormack and Detective Paul Deluca, were on their way upstairs to arrest the defendant, Banks telephoned Solomon to see if the defendant would talk to police, and Solomon said that he would. Banks spoke with the two officers who were in the building and told them not to handcuff the defendant yet since he was willing to speak with the police.

The two officers met Solomon at the door to his office and were invited into a conference room. Solomon and the defendant sat on one side of a conference table, and the two officers sat on the other side. McCormack stated that a double shooting and home invasion had taken place in Winchester the previous night, that one of the victims had died, and that the surviving victim had identified the defendant from a photographic array. McCormack, Solomon, and the defendant then conducted an interview in conversational tones; Deluca observed but did not take part in the questioning. Police did not give the defendant

Miranda warnings prior to or during the questioning, and Solomon made no representations that he had advised the defendant of the Miranda warnings. The defendant denied that he had anything to do with the shootings and provided an alibi for the time during which they occurred.

Five or ten minutes after the interview began, Banks entered the conference room and asked to speak with McCormack; the two officers spoke privately for a few minutes. Solomon then left the conference room and told Banks that he was ending the interview. Police told Solomon that they were going to arrest the defendant, and proceeded to do so. The defendant was read the Miranda warnings during the booking process at the police station.

The defendant was indicted on charges of murder, home invasion, armed robbery, assault and battery by means of a dangerous weapon causing serious bodily injury, and possession of a firearm without a license. He filed a motion to suppress the statements made to the police in his attorney's office on the ground that they were not made willingly, knowingly, and voluntarily because police had not provided him the Miranda warnings prior to the questioning.[3] The judge denied the defendant's motion because he concluded that the presence of the defendant's attorney during the questioning, coupled with the defendant's opportunity to speak with his attorney for forty-five minutes prior to questioning, was an adequate effective safeguard and satisfied constitutional requirements. Pursuant to G. L. c. 278, § 28E, and Mass. R. Crim. P. 15, as appearing in 422 Mass. 1501 (1996), the defendant filed an application for interlocutory appeal; a single justice in the county court allowed the appeal, and the case was entered on the docket of this court.

While the interlocutory appeal was pending, the defendant

---

[3]The defendant attached to the motion to suppress, see Mass. R. Crim. P. 13, as appearing in 442 Mass. 1516 (2004), an affidavit in which he stated that he met with Solomon on the morning of October 24, 2007, the date of his interview by the police, on an unrelated matter in which Solomon was his attorney, and that neither Solomon nor anyone else explained the Miranda warnings to him. Solomon also filed an affidavit averring that the defendant came to his office that morning for an unrelated matter; that the police questioning of the defendant "was on a matter unrelated to [Solomon's] relationship with [the defendant]"; that the police did not give Miranda warnings to the defendant in Solomon's presence; and that Solomon did not explain the Miranda warnings to the defendant.

filed a motion in limine to exclude the content of the 911 telephone call and a motion to dismiss. The motion to dismiss, filed two weeks after Bryan Barbaro's death, asserted that without his testimony there was insufficient evidence to support a conviction. The same judge who had ruled on the motion to suppress denied the defendant's motion in limine; he took no action on the motion to dismiss. The judge also reported his decision on the motion in limine to the Appeals Court. We transferred the appeal from the Appeals Court on our own motion and consolidated the two appeals.

2. *Motion to suppress statements.* The defendant contends that the motion judge erred in denying the motion to suppress his statements made to police on the morning of the shootings. The defendant argues that his statements must be suppressed because, during a custodial interrogation, he was not given Miranda warnings before speaking to police. The Commonwealth contends that the judge erred in determining that the defendant was in custody at the time he made the statements, and asserts that, because the defendant was not in custody, no Miranda warnings were necessary. Alternatively, the Commonwealth argues that, if the judge determined correctly that the defendant was in custody, the judge was also correct in holding that the opportunity to consult with counsel before questioning, and the presence of the defendant's counsel during questioning, obviated the need for Miranda warnings. In reviewing a decision on a motion to suppress that bears on issues of a constitutional dimension, we accept the judge's findings of fact unless clearly erroneous, but independently apply constitutional principles to the facts as found. See *Commonwealth* v. *Leahy*, 445 Mass. 481, 485 (2005).

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."[4] In *Miranda, supra,* the United States Supreme Court established a "prophylactic" mechanism, see *New York* v. *Quarles*, 467 U.S. 649, 653 (1984), to safeguard the protections afforded by the Fifth Amendment during police interrogation. The Miranda warnings established

[4]The privilege against self-incrimination applies to the States through the Fourteenth Amendment to the United States Constitution. See *Malloy* v. *Hogan*, 378 U.S. 1, 8 (1964). See also *Escobedo* v. *Illinois*, 378 U.S. 478, 490-491 (1964).

by the Court require that, prior to custodial interrogation, a suspect must "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda, supra* at 444.

The Court's primary concern in establishing the Miranda warnings was that the coercive atmosphere created by police custody and interrogation would "subjugate the individual to the will of [the] examiner" and undermine the privilege against compelled self-incrimination. See *Miranda, supra* at 457-458. As the Court stated:

> "The Fifth Amendment privilege is so fundamental to our system of constitutional rule and the expedient of giving an adequate warning as to the availability of the privilege so simple, we will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given. Assessments of the knowledge the defendant possessed . . . can never be more than speculation; . . . a warning is a clearcut fact. More important, whatever the background of the person interrogated, a warning at the time of the interrogation is indispensable to overcome its pressures and to insure that the individual knows he is free to exercise the privilege at that point in time.

> "The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court. This warning is needed in order to make him aware not only of the privilege, but also of the consequences of forgoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege. Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system — that he is not in the presence of persons acting solely in his interest."

*Id.* at 468-469.

Because of the possibility of coercion inherent in custodial interrogation, "in the absence of specific warnings," the Miranda rule creates a generally irrebuttable presumption of coercion and renders the individual's statement inadmissible at trial. See *United*

*States* v. *Patane*, 542 U.S. 630, 639 (2004), citing *Dickerson* v. *United States*, 530 U.S. 428, 434-435 (2000), and *Miranda, supra* at 467. See also *Harris* v. *New York*, 401 U.S. 222, 225 (1971). To meet minimum protections under the Fifth Amendment, the prosecution bears the burden of proof to establish that any waiver of the privilege against self-incrimination was willingly, knowingly, and intelligently made. See *Miranda, supra* at 475. Although no precise form of words is constitutionally required, the substance of the Miranda warnings is of constitutional dimension. See *Dickerson* v. *United States, supra* at 432, 437-444.

Because Miranda warnings are required only when a suspect is subject to custodial interrogation, we consider first the judge's finding that the defendant was in custody at the time he spoke with the police. Whether a defendant is in custody depends on four factors: "(1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that that person is a suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the person being interviewed; and (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with an arrest." *Commonwealth* v. *Groome*, 435 Mass. 201, 211-212 (2001), citing *Commonwealth* v. *Morse*, 427 Mass. 117, 121-127 (1998), and *Commonwealth* v. *Bryant*, 390 Mass. 729, 737 (1984). The critical question in determining whether an individual is in custody is whether a reasonable person in the individual's position would feel free to leave. *Commonwealth* v. *Damiano*, 422 Mass. 10, 13 (1996), citing *Berkemer* v. *McCarty*, 468 U.S. 420, 442 (1984).

In this case, the judge found that the defendant was aware that six or seven police officers had followed him from Medford to Boston and were waiting to speak with him on the sidewalk outside his attorney's office. An hour after the defendant entered his attorney's office, police were still waiting for him. An officer informed the defendant at the beginning of the interview that police were investigating a shooting in which one of the victims had died, and that the defendant had been identified as the shooter by the surviving victim. Thus, even though the

interview took place in the defendant's attorney's office, lasted for no more than five or ten minutes, and was conducted in a conversational tone, a reasonable person in the defendant's position would not have believed he was free to leave. In addition, the defendant was arrested at the conclusion of the interview. Therefore, the motion judge was correct in concluding that the defendant was in custody when he made the statements he seeks to suppress.

The judge determined further that Miranda warnings were unnecessary in these circumstances because the defendant had an opportunity to consult with his attorney before questioning and the attorney was present during questioning. In reaching this conclusion, the judge relied on a statement by the *Miranda* Court that the specific warnings set forth in its decision are not the only permissible means for protecting the right against self-incrimination. The Court stated that "other fully effective means . . . to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it" would also be permissible. *Miranda, supra* at 444. The judge concluded that "adequate" time to consult with counsel and the presence of counsel during interrogation "would be the adequate protective device necessary to make the process of police interrogation conform to the dictates of the privilege." *Miranda, supra* at 466.

Those courts that have considered the issue have divided on whether the presence of counsel during custodial interrogation obviates the need for Miranda warnings. Some courts have held that Miranda warnings are necessary notwithstanding the presence of an attorney during questioning. See *State* v. *Joseph,* 109 Haw. 482, 496 (2006); *State* v. *DeWeese,* 213 W. Va. 339, 348 (2003). Others have held that the presence of counsel alone is an adequate effective substitute for Miranda warnings. See *United States* v. *Guariglia,* 757 F. Supp. 259, 264 (S.D.N.Y. 1991); *United States* v. *Thevis,* 469 F. Supp. 490, 507-508 (D. Conn.), aff'd without opinion, 614 F.2d 1293 (2d Cir. 1979), cert. denied, 446 U.S. 908 (1980); *State* v. *Bethel,* 110 Ohio St. 3d 416, 426-427 (2006).[5] See also 2 W.R. Lafave, J.H. Israel, N.J. King, & O.S. Kerr, Criminal Procedure § 6.8(a), at 800

---

[5]Although the courts' holdings in all these cases did not rely on the opportunity to consult with counsel, the defendants did in fact consult with their attorneys prior to the custodial interrogation. See *United States* v. *Guariglia,*

(3d ed. 2007).[6] However, the majority of courts that have reached the issue have held that Miranda warnings are not necessary when an attorney is present during questioning and the suspect had an opportunity to consult with the attorney prior thereto. See *Smith* v. *State*, 832 So. 2d 92, 98 (Ala. Ct. Crim. App. 2001); *People* v. *Mounts*, 784 P.2d 792, 795-796 (Colo. 1990); *State* v. *Vos*, 164 P.3d 1258, 1262-1263 (Utah App. 2007).[7]

We conclude that the presence of an attorney during questioning, when combined with the opportunity to consult with the attorney beforehand, substitutes adequately for Miranda warnings. The central concern of the *Miranda* Court was safeguarding the right against self-incrimination in the inherently coercive environment of custodial police interrogation. See *Miranda, supra* at 445-458 (explaining how police interrogation techniques render custodial interrogation inherently coercive). The Miranda warnings are not an independent right, but serve as a safeguard of the underlying right against self-incrimination. See *Michigan* v. *Tucker*, 417 U.S. 433, 444 (1974). In the *Miranda* decision, the Court recognized that warnings are not the only permissible way to protect a suspect's right against self-incrimination in the custodial setting. The warnings are not necessary when "other

757 F. Supp. 259, 262 (S.D.N.Y. 1991); *United States* v. *Thevis*, 469 F. Supp. 490, 499 (D. Conn.), aff'd without opinion, 614 F.2d 1293 (2d Cir. 1979), cert. denied, 446 U.S. 908 (1980); *State* v. *Bethel*, 110 Ohio St. 3d 416, 420 (2006).

[6]In apparent response to *State* v. *Joseph*, 109 Haw. 482, 496 (2006), and *State* v. *DeWeese*, 213 W. Va. 339, 348 (2003), the supplement to an earlier version of this treatise stated that "[t]he need for self-incrimination warnings is not obviated by presence of defense counsel at the time of interrogation." 2 W.R. Lafave, J.H. Israel, & N.J. King, Criminal Procedure § 6.8, at 181 (2d ed. Supp. 2007). Citing *State* v. *Bethel*, 110 Ohio St. 3d 416 (2006) (collecting cases in accord), the treatise states now, as it did in the edition published prior to the decisions in *State* v. *Joseph* and *State* v. *DeWeese*, that "[i]t is generally accepted that if the attorney was actually present during the interrogation, then this obviates the need for the warnings." 2 W.R. Lafave, J.H. Israel, & N.J. King, & O.S. Kerr, Criminal Procedure § 6.8(a), at 800 (3d ed. 2007). See 2 W.R. Lafave, J.H. Israel, & N.J. King, Criminal Procedure § 6.8(a), at 573 (2d ed. 1999).

[7]*Sweeney* v. *Carter*, 361 F.3d 327, 331 (7th Cir.), cert. denied, 543 U.S. 1020 (2004), states in dictum that prior consultation with an attorney is not an effective equivalent to the Miranda warnings. However, it does not address the question with which we are here concerned, whether the presence of an attorney at questioning and a prior opportunity to consult with the attorney is an adequate substitute.

fully effective means . . . to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it" are present. *Miranda, supra* at 444.

The presence of an attorney during interrogation and the opportunity to consult with counsel beforehand are "the adequate protective device[s] necessary to make the process of police interrogation conform to the dictates of the privilege. [An attorney's] presence . . . insure[s] that statements made in the government-established atmosphere are not the product of compulsion." *Id.* at 466. When counsel is present at an interrogation, the attorney can "detect and describe even the most subtle coercive or suggestive influences." See *Commonwealth* v. *Cunningham*, 471 Pa. 577, 584 (1977). The presence of counsel is particularly effective in eliminating police coercion when the defendant has the opportunity to consult with an attorney in private prior to questioning.[8] See *State* v. *Vos, supra* at 1263. Because the presence of counsel and the opportunity to consult with a lawyer beforehand, like Miranda warnings, "eliminate[] the evils in the interrogation process," *Miranda, supra* at 466, they are a fully effective substitute for the warnings in counteracting the coercion inherent in custodial interrogation.

Our holding today is consistent with the United States Supreme Court's decision in *Dickerson* v. *United States*, 530 U.S. 428 (2000). In *Dickerson,* the Court reiterated what it had stated thirty-four years earlier in the *Miranda* decision itself: Miranda warnings are not required where a fully effective substitute is present. The Court explained in *Dickerson* that, although the Constitution does require a "procedure that is effective in secur-

---

[8]The defendant and the attorney submitted with the motion to suppress affidavits stating that they did not discuss the defendant's Miranda rights during their meeting prior to the interrogation. We pass the fact that these affidavits were not evidence at the hearing on the motion to suppress, see J. Grasso & C. McEvoy, Suppression Matters Under Massachusetts Law § 2-3[d][3], at 2-10 (2008-2009), and that no such evidence was presented at said hearing. Court holdings requiring that a defendant have an opportunity to consult with an attorney do not make the attorney's recitation of the warnings, or any other specific conduct of the attorney during consultation or questioning, prerequisites to a finding that a fully effective substitute for the Miranda warnings existed in particular circumstances (although courts have sometimes noted the usefulness of such discussions). It is the opportunity to consult that is required. Accordingly, here the defendant's rights were protected regardless of the specific contents of the consultation between him and the attorney.

ing [accused persons'] Fifth Amendment rights," the "particular Miranda warnings" are not constitutionally required in all circumstances. *Id.* at 440 n.6. Additionally, the *Dickerson* Court expressly rejected the proposition set forth in the dissent in that case that "nothing else [other than Miranda warnings] will suffice to satisfy constitutional requirements." *Id.* at 442. Nor did the Court, by invalidating a Federal statute allowing the admission of all voluntary confessions, suggest in any way that the presence of counsel is not an adequate effective substitute for Miranda warnings. See *id.* at 435-436, 442-443. What the Court held in *Dickerson* was that a statute that directed courts to assess the voluntariness of confessions by using a totality of the circumstances test conflicted with *Miranda* because it revived an approach to the subject that the Court had already determined was inadequate to ensure that Fifth Amendment rights would be observed. *Id. Dickerson* addressed the acceptability of a totality of the circumstances test, not the existence or identity of other adequate safeguards of the Fifth Amendment privilege.

Having concluded that the presence of an attorney and a prior opportunity to consult with counsel adequately protect suspects' rights under the Fifth Amendment, we must consider whether they also suffice to protect suspects' rights under art. 12 of the Declaration of Rights of the Massachusetts Constitution. We have "consistently held that art. 12 requires a broader interpretation [of the right against self-incrimination] than that of the Fifth Amendment." *Commonwealth* v. *Mavredakis*, 430 Mass. 848, 858-859 (2000), quoting *Opinion of the Justices*, 412 Mass. 1201, 1210 (1992). Accordingly, where Federal law is insufficient to protect the broader rights against self-incrimination guaranteed by art. 12, we have adopted additional rules under the Massachusetts Constitution to secure those rights. See *Commonwealth* v. *Martin*, 444 Mass. 213, 221 (2005).

Thus, when the Supreme Court held that voluntary but unwarned incriminating statements do not taint later questioning accompanied by Miranda warnings, see *Oregon* v. *Elstad*, 470 U.S. 298 (1985), we concluded as a matter of State common law that such pre-Miranda questioning presumptively taints the subsequent statements. See *Commonwealth* v. *Smith*, 412 Mass. 823, 829-837 (1992). See also *Commonwealth* v. *Martin*, *supra*

at 221-222 (adopting common-law rule that physical evidence obtained from failure to provide Miranda warnings is presumptively excludable). Likewise, when the Supreme Court held that the United States Constitution creates no obligation for police to inform a suspect of an attorney's attempts to provide legal advice unless the suspect requested the services, see *Moran* v. *Burbine*, 475 U.S. 412 (1986), we ruled that art. 12 requires police to inform suspects of such offers of legal assistance. See *Commonwealth* v. *Mavredakis, supra* at 859-860. When the Supreme Court held that the United States Constitution permits the prosecution to introduce the physical fruits of a voluntary but unwarned statement to police in its case-in-chief, see *United States* v. *Patane*, 542 U.S. 630 (2004), we decided that art. 12 forbids the use of the product of an unwarned statement. See *Commonwealth* v. *Martin, supra* at 218-219.

However, when Federal law is adequate to protect the rights secured by art. 12, a separate State law rule is not required. See *Commonwealth* v. *Martin, supra* at 221. Here, the factors that led us in past cases to conclude that Federal law was insufficient to protect art. 12 rights are not present. In past cases, an important factor in our determination that Federal law was inadequate to protect the broader right against self-incrimination secured by art. 12 was the need to deter police from ignoring the requirements of *Miranda* where doing so would provide police with a greater chance of obtaining incriminating evidence. We have sought to deter police from "first questioning the suspect without benefit of the warnings, and then, having obtained an incriminating response , . . . giving the Miranda warnings and questioning the suspect again in order to obtain an admissible statement." *Commonwealth* v. *Smith, supra* at 829. We have sought also to prevent police from interfering with the lawyer-client relationship by concealing from suspects attorneys' offers of legal assistance, *Commonwealth* v. *Mavredakis, supra* at 860, and to remove the incentive for police to ignore the requirements of *Miranda* in order to obtain physical evidence, see *Commonwealth* v. *Martin, supra* at 219.

In contrast to the circumstances addressed in these cases, the omission of Miranda warnings confers no advantage on the police when the interview of the suspect takes place in the presence of an attorney. Where a suspect has a lawyer present dur-

ing questioning and a prior opportunity to consult with the attorney, adequate safeguards against involuntary self-incrimination and police coercion are present. See *supra* at 289-290. Because the police do not gain an advantage from omitting the Miranda warnings where such safeguards are present, there is no need to expand on Federal law in order to preserve State constitutional rights.

The dissent suggests that by focusing on the likelihood of police misconduct, we ignore "that art. 12 has substantive content independent of the Fifth Amendment." See *post* at 304. We agree with the dissent that art. 12 provides broader substantive protection against self-incrimination than its Federal counterpart. By considering the potential for police misconduct, we do not hold that the only purpose of art. 12 is to deter such misconduct. We recognize merely that the potential for police misconduct is relevant to whether the right against self-incrimination is adequately protected. See, e.g., *Commonwealth* v. *Martin, supra* at 219-221. Where, as here, the defendant has both the opportunity to consult with an attorney and an attorney by his side, sufficient protection exists against any police misconduct. There is no need to require a more protective rule under art. 12 than is available under Federal law.

Furthermore, the dissent fails to explain adequately why an attorney is less likely than a police officer to inform a suspect of the right against self-incrimination. Unlike a police officer, an attorney represents the suspect's interests. The opportunity to consult with a lawyer requires a private meeting where the lawyer can explain the suspect's rights prior to custodial interrogation. This setting is at least as conducive to communicating the suspect's rights as is a warning given by police in the more confrontational and intense surroundings of the interrogation room.

The dissent contends also that our holding allows counsel to waive the right against self-incrimination on behalf of a suspect. See *post* at 305-306. While the dissent is correct that the right against self-incrimination is personal and may only be waived by the individual being interrogated, see *Moran* v. *Burbine, supra* at 433 n.4, nothing in our decision suggests otherwise. The decision whether to speak with the police during custodial interrogation belongs to the suspect. This is true whether the suspect is informed of the right against self-incrimination by police or

by prior consultation with an attorney who is present during questioning. Today's holding concerns only the method by which the suspect is informed of his or her constitutional rights prior to questioning.

Another factor that has motivated us to depart from Federal decisions is the need to preserve bright-line rules in the Miranda context. See *Commonwealth* v. *Martin, supra* at 223; *Commonwealth* v. *Smith, supra* at 836-837. In this case, the rule we adopt is a bright-line rule. To determine whether Miranda warnings were required, a judge need only determine whether a suspect's lawyer was present during questioning and whether the suspect had an opportunity to consult with the lawyer beforehand. The judge need not engage in fact-intensive inquiries into the voluntariness of the suspect's statement. Contrast *Commonwealth* v. *Smith, supra* at 836-837 (rule presuming that unwarned questioning taints later warned questioning necessary to avoid fact-bound voluntariness inquiries).

The dissent argues that the rule we adopt is not actually a bright-line rule. See *post* at 306-307. However, the rule we set forth today is no more nor less a bright-line rule than that propounded by the dissent. Each rule requires an objectively determinable fact; the dissent's rule requires the giving of warnings, and our rule requires the presence of counsel and an opportunity to confer. Definitionally, these are both bright-line rules, i.e., there is no disagreement regarding which rule applies. Deciding whether either bright-line rule is satisfied, however, may in some circumstances require additional factual determinations; such determinations are no easier under the dissent's formulation than under ours. We know from past cases that whether warnings have been given is often contested and, in certain situations where it is conceded they are given, their effect is contested, either because the suspect does not speak the language used by the officer or because for other reasons the suspect does not understand the warnings. See, e.g., *Commonwealth* v. *Iglesias*, 426 Mass. 574, 577-578 (1998); *Commonwealth* v. *Colby*, 422 Mass. 414, 418-419 (1996).

Our approach may admittedly invite disputes contesting whether counsel was in fact present and whether there was opportunity to consult beforehand. Such determinations are no more difficult to

resolve than the factors decided in connection with the giving of warnings. The dissent's assertion that only its rule creates a bright-line rule is therefore misleading. Neither solution is perfect; the factual issues concerning the giving of warnings which arose in our previous cases are simply replaced by similar questions concerning the presence of counsel.

In this case, the attorney was present during the entirety of the interrogation, and the defendant had the opportunity to consult with the attorney in private beforehand. Accordingly, the defendant's right against self-incrimination was fully protected even in the absence of Miranda warnings. The motion to suppress the defendant's statements was properly denied.

3. *Motion to exclude transcription of 911 telephone call.* The defendant asserts that the motion judge erred in denying his motion to exclude from evidence the surviving victim's statements to a 911 dispatcher in a telephone call made immediately after the shootings. The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Similarly, art. 12 of the Massachusetts Declaration of Rights provides that "every subject shall have a right to produce all proofs that may be favorable to him [and] to meet the witnesses against him face to face."[9] Following the United States Supreme Court's decisions in *Crawford* v. *Washington*, 541 U.S. 36 (2004) (*Crawford*), and *Davis* v. *Washington*, 547 U.S. 813 (2006) (*Davis*), the admissibility of out-of-court statements is determined using a two-step inquiry. First, the statement must be admissible pursuant to the rules of evidence. *Commonwealth* v. *Nesbitt*, 452 Mass. 236, 243 (2008). Second, the statement must be admissible under the confrontation clause. *Id.* The motion judge held that the statement was admissible under the rules of evidence because it was a spontaneous utterance, and that it satisfied the confrontation clause because it was nontestimonial.

We turn first to the judge's determination that the statement

[9]Although art. 12 of the Massachusetts Declaration of Rights often provides individuals with greater protection than the United States Constitution, *supra* at 291-292, in cases involving the hearsay rule and its exceptions, art. 12 provides protection coextensive with the confrontation clause of the United States Constitution. *Commonwealth* v. *DeOliveira*, 447 Mass. 56, 57 n.1 (2006).

was admissible under the rules of evidence as a spontaneous utterance. A statement qualifies as a spontaneous utterance if "there is an occurrence or event 'sufficiently startling to render inoperative the normal reflective thought processes of the observer' " and "the declarant's statement was 'a spontaneous reaction to the occurrence or event and not the product of reflective thought.' " *Commonwealth* v. *Santiago*, 437 Mass. 620, 623 (2002), quoting 2 McCormick, Evidence § 272, at 204 (5th ed. 1999). A judge has broad discretion in determining whether a statement meets these two criteria, and the application of these criteria will be reversed only if there was an abuse of that broad discretion. See *Commonwealth* v. *Ruiz*, 442 Mass. 826, 832 (2004).

There was no error in the judge's ruling. Here, both criteria of the spontaneous utterance exception were satisfied. Someone entered the victim's home and shot both the victim and his brother. The victim made his statements to the 911 dispatcher soon thereafter, while he was suffering from a gunshot wound and while he was aware of his brother's life-threatening condition. The content and tone of his statements indicate that the victim was in pain and agitated about his medical state and that of his brother. The shootings were startling events, and the victim's 911 telephone call and his responses to the dispatcher's questions were a spontaneous reaction to those events. See *Commonwealth* v. *Nesbitt*, *supra* at 246 (victim's 911 telephone call describing her severe stabbing minutes earlier was spontaneous utterance). Accordingly, the victim's statements to the dispatcher are admissible under the spontaneous utterance exception to the hearsay rule.

We turn next to the admissibility of the statements under the confrontation clause. We accept the judge's findings of fact unless clearly erroneous but independently apply constitutional principles to the facts found. See *Commonwealth* v. *Leahy*, 445 Mass 481, 485 (2005). The confrontation clause bars the admission of testimonial out-of-court statements by a declarant who does not appear at trial unless the declarant is unavailable to testify and the defendant had an earlier opportunity to cross-examine him. See *Crawford*, *supra* at 53-54. Such testimony is inadmissible even if the statement fits in an exception to the hearsay rule. *Id.* at 55-56.

In response to the Supreme Court's decision in *Crawford*, we adopted a two-step test for determining whether an out-of-court statement is testimonial. See *Commonwealth* v. *Nesbitt, supra* at 243. First, we determine whether the statement is testimonial per se. See *Commonwealth* v. *Gonsalves*, 445 Mass. 1, 13 (2005) (*Gonsalves*). A statement is testimonial per se if it was made in a formal or solemnized form (such as a deposition, affidavit, confession, or prior testimony) or in response to law enforcement interrogation. *Id.* However, law enforcement interrogation "does not include emergency questioning . . . to secure a volatile scene or determine the need for or provide medical care." *Id.* Second, if a statement is not testimonial per se, we consider whether the statement is nonetheless testimonial in fact. *Id.* at 12. A statement is testimonial in fact if "a reasonable person in the declarant's position would anticipate the statement's being used against the accused in investigating and prosecuting the crime." *Id.* at 12-13.

The two-step inquiry set forth in *Gonsalves* was announced before the United States Supreme Court, in its opinion in *Davis*, defined an emergency exception for statements made to law enforcement officers. The Court enumerated four factors for determining whether a statement to an officer, which would otherwise be testimonial per se, qualifies for this exception and is therefore nontestimonial. See *Davis, supra* at 827; *Commonwealth* v. *Nesbitt, supra* at 247. The factors, as summarized in *Commonwealth* v. *Galicia*, 447 Mass. 737 (2006), are "(1) whether the 911 caller was speaking about 'events *as they were actually happening* rather than describ[ing] past events'; (2) whether any reasonable listener would recognize that the caller was facing an 'ongoing emergency'; (3) whether what was asked and answered was, viewed objectively, 'necessary to be able to *resolve* the present emergency, rather than simply to learn . . . what had happened in the past,' including whether it was necessary for the dispatcher to know the identity of the alleged perpetrator; and (4) the 'level of formality' of the interview" (emphasis in original). *Commonwealth* v. *Galicia, supra* at 743-744, quoting *Davis, supra* at 827.

The Court's decision in *Davis* clarified that only the first step of the *Gonsalves* test applies to statements made to law enforcement officers during an emergency. Statements made in response to police questioning during an emergency are testimonial per

se unless the emergency exception, as defined in *Davis*, applies. To the extent that the exception applies, the statements are not testimonial per se and they will not become testimonial in fact in any circumstances. To the extent that the emergency exception does not apply, statements made in response to police interrogation remain testimonial per se.[10]

The United States Supreme Court has assumed that 911 dispatchers, when they conduct interrogation of 911 callers, are law enforcement agents for the purposes of confrontation clause analysis. See *Davis*, *supra* at 823 n.2; *Commonwealth* v. *Galicia*, *supra* at 742 n.11. Therefore, the victim's responses to the 911 dispatcher's questions in this case were testimonial per se unless the questioning was intended to secure a volatile scene or to determine the need for or provide medical care. See *Gonsalves*, *supra* at 13.

We conclude that most of the statements the victim made to the 911 dispatcher in this case were not testimonial per se. The 911 telephone call here was similar to the one we deemed nontestimonial in *Commonwealth* v. *Nesbitt*, *supra* at 247-248. In that case, a victim dialed 911 after suffering severe stab wounds. *Id.* at 239-240. When she told the 911 operator that someone had tried to kill her, the operator sought to determine her location, the identity of the perpetrator, whether the attacker was still present, and the nature of her injuries. *Id.* at 244 n.13.

Applying the *Davis* factors, we held that the statements the victim made to the operator were nontestimonial because she was facing an ongoing emergency, the dispatcher's questions were tailored to resolve the emergency, and the questioning was informal. *Id.* at 247-248. We specifically noted that the operator's inquiry into the perpetrator's identity did not render the statement testimonial because, at the time of his inquiry, the operator did not know whether the attacker was still present at the scene. *Id.* at 248. When a victim making a 911 telephone call raises "the possibility that a violent (and perhaps armed) individual might still [be] at the scene," it is "necessary for the dispatcher to determine the identity of the perpetrator and to ascertain whether the first responders would be encountering a dangerous situation."

---

[10]However, both steps of the test set forth in *Commonwealth* v. *Gonsalves*, 445 Mass. 1, 13 (2005), continue to apply to statements made to people other than law enforcement officers.

*Id.* Knowledge of the perpetrator's identity assists the responding officers in determining whether the individual "has a record of violence or mental disorder" and enables the officers to "know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim." *Hiibel* v. *Sixth Judicial Dist. Court of Nev.*, 542 U.S. 177, 186 (2004). Accordingly, in such circumstances, an inquiry into the perpetrator's identity is "aimed at resolving the present emergency and not at conducting an investigation." *Commonwealth* v. *Nesbitt, supra* at 248. See also *Davis, supra* at 827 (dispatcher's "effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a dangerous felon," indicates attempt to resolve emergency rather than to investigate crime).

The 911 telephone call in the present case was, in most respects, similar to the emergency call in *Commonwealth* v. *Nesbitt*.[11] The presence of an ongoing emergency was clear; the dispatcher's

---

[11]The pertinent portions of the 911 telephone call in the present case that were not testimonial per se are as follows:

CALLER:      "I need a police car and an ambulance at 70 Irving Street. I've been shot."

DISPATCHER:  "You've been shot?"

CALLER:      "Yes, I've been robbed."

DISPATCHER:  "Where are you?"

CALLER:      "My brother has been shot. 70 Irving Street, Winchester."

DISPATCHER:  "How many people have been shot?"

CALLER:      "Two."

DISPATCHER:  "Two?"

CALLER:      "My brother is on the ground. He's not breathing well. I've been shot. I'm bleeding."

             . . .

DISPATCHER:  "Who did this to you?"

CALLER:      "I think his name is Wally, a black kid."

             . . .

DISPATCHER:  "Can you give me a description of the person that — that did the shooting?"

questions were aimed at resolving the emergency and protecting the responding officers; and the questioning was informal. See *Commonwealth* v. *Nesbitt, supra* at 247-248. Contrast *Commonwealth* v. *Lao*, 450 Mass. 215, 226 (2007) (no ongoing emergency present when caller left scene of attack, arrived home, and engaged in several other telephone conversations before making 911 telephone call reporting husband's attempt to hit her with motor vehicle). The victim called 911 to obtain assistance with a serious medical emergency. The dispatcher attempted to determine how many victims there were and urged the caller to remain awake and to treat his wound with a cloth or towel. When the victim reported the shooting and robbery, the dispatcher did not know whether the perpetrator was still in the vicinity.[12] Accordingly, the statements in the 911 telephone call in which the victim identified the nature of the emergency and described the shooter were not testimonial per se.[13]

Although much of the 911 call was not testimonial per se, five statements contained therein were testimonial per se because, viewed objectively, they would not have helped resolve the ongoing emergency or secure the crime scene. See *Davis, supra* at 827. Two of these statements described the shooting itself in detail, and the other three statements informed the dispatcher that the assailant "worked out" at Mike's Gym.

The victim's two statements describing the shooting in great detail related to past events; they were not relevant to resolving the medical emergency, securing the crime scene, or protecting emergency personnel responding to the call. See *Davis, supra* at 827. These statements stand in contrast to the statements held

---

CALLER:      "He's Jamaican."

DISPATCHER:  "Jamaican?"

CALLER:      "He's driving a black — it looks like a Jeep . . . ."

[12]Statements made by the first responding police officers, which are audible on the recording of the 911 telephone call, establish further the uncertainty regarding whether the perpetrator was still at the scene. An officer asked the victim if there was anyone else present and asked him to put his hands up.

[13]The victim's initial identification of the assailant's first name was not testimonial because it was provided in response to an attempt to learn the identity of a violent felon who may still have been present at the scene. The victim's description of the assailant's vehicle as a black Jeep was not testimonial for the same reason.

nontestimonial in *Commonwealth* v. *Nesbitt, supra* at 244 n.13, where the victim described the crime at only the most general level. Thus, the two statements describing the particulars of the shootings were testimonial per se and are inadmissible under the confrontation clause.[14]

On three occasions, the victim told the dispatcher that his assailant "worked out" at Mike's Gym. Although a description may provide officers with information that assists them in assessing the danger a perpetrator poses to responding officers, victims, and bystanders, and thus may not be testimonial in certain circumstances, see *supra* at 298-299, the statements about Mike's Gym were not of that nature. The fact that the shooter "worked out" at Mike's Gym did not by itself tell the police anything that would have helped them secure the crime scene or protect the arriving officers. Moreover, two of the three times the victim referred to Mike's Gym he suggested that the police contact the establishment at a later time to obtain more information about the assailant. Thus, viewed objectively, these statements would not have helped to resolve the emergency as it occurred. See *Davis, supra* at 827. Accordingly, the statements about Mike's Gym were testimonial per se.[15]

4. *Conclusion.* The denial of the defendant's motion to suppress statements is affirmed. The denial of the defendant's motion to exclude testimonial hearsay is affirmed in part. Those statements made during the 911 telephone call that are nontestimonial, as discussed herein, are admissible. Those statements made during the 911 telephone call that we have identified as testimonial shall be excluded from evidence.

*So ordered.*

BOTSFORD, J. (dissenting, with whom Marshall, C.J., and Spina,

[14]The first statement to be redacted for this reason is "I went down to see what went on. I caught the — the robber." The second statement to be redacted for the same reason is "I was stupid. I tried to grab the gun out of his hand."

[15]The three statements that must be redacted for this reason follow. (1) "I know he works at — out at Gold's. He works out at Mike's Gym. I know him. His name is Wally." (2) "I don't know his last name. I've always known him as Wally. I'm going to have to call Mike's Gym tomorrow." (3) "He worked out at Mike's Gym for a long time. They should have information on him if you call them tomorrow."

J., join). As the court recognizes, since the United States Supreme Court's decision in *Miranda* v. *Arizona*, 384 U.S. 436 (1966) (*Miranda*), persons in Massachusetts subject to custodial interrogation by the police have been entitled to receive, at the threshold of the interrogation, a recitation of what have become known as the Miranda warnings: that they have right to remain silent, that anything they say can be used against them, that they have a right to the presence of an attorney, and that, if they cannot afford an attorney, one will be appointed. *Ante* at 285-286. *Miranda* was, of course, based wholly on the Fifth Amendment to the United States Constitution, but this court has recognized that the administration of the Miranda warnings also protects the independent right against self-incrimination to which Massachusetts citizens are entitled under art. 12 of the Massachusetts Declaration of Rights. See *Commonwealth* v. *Snyder*, 413 Mass. 521, 531 (1992). See also *Commonwealth* v. *Martin*, 444 Mass. 213, 221 (2005).

Despite the long history in the Commonwealth of insisting on the administration of Miranda warnings, the court today holds that even where no such warnings are given, the right against self-incrimination guaranteed by the Fifth Amendment, and separately by art. 12, is adequately safeguarded during custodial police interrogation by "the presence of an attorney during questioning, when combined with the opportunity to consult with the attorney beforehand." *Ante* at 289. While it is true that a number of other courts have taken the same view of what the Fifth Amendment requires, see *ante* at 289, the United States Supreme Court has never considered the issue directly, and the *Miranda* decision itself sent conflicting signals on it.[1] But I do not dwell on the Fifth Amendment, because I conclude that the

---

[1]In *Miranda* v. *Arizona*, 384 U.S. 436, 466 (1966) (*Miranda*), as the court indicates, the United States Supreme Court observed: "The presence of counsel . . . would be the adequate protective device necessary to make the process of police interrogation conform to the dictates of the privilege [against self-incrimination]." But in the very next paragraph, the Court stated the following:

"Without the protections flowing *from adequate warning and* the rights of counsel, 'all the careful safeguards erected around the giving of testimony [at trial], whether by the accused or any other witness, would become empty formalities in a procedure where the most compelling possible evidence of guilt, a confession, would have already been

rule announced by the court does not satisfy the more stringent requirements of art. 12. Accordingly, I dissent.[2]

We have recognized that "[t]he text of art. 12, as it relates to self-incrimination, is broader than the Fifth Amendment."[3] *Commonwealth* v. *Mavredakis*, 430 Mass. 848, 858 (2000). See *Attorney Gen.* v. *Colleton*, 387 Mass. 790, 796, 800-801 (1982). As several post-*Miranda* decisions of the United States Supreme Court have reflected "shrinking protections afforded to the Federal right against self-incrimination," *Commonwealth* v. *Martin*, 444 Mass. at 221, this court has focused more closely than it had in the past on the independent requirements of art. 12. In doing so, we have "provided additional protections under the common law, protections that go beyond what the Supreme Court would require in similar circumstances as a matter of [Federal] constitutional imperative." *Commonwealth* v. *Snyder*, 413 Mass. at 531. See, e.g., *Commonwealth* v. *Martin*, *supra* at 215, 223 (declining to follow *United States* v. *Patane*, 542 U.S. 630 [2004], and adopting common-law rule to safeguard "parallel but broader protections afforded . . . by art. 12"); *Commonwealth* v. *Mavredakis*, *supra* at 859-860 (declining to follow *Moran* v. *Burbine*, 475 U.S. 412 [1986], under art. 12); *Commonwealth* v. *Smith*, 412 Mass. 823, 835-836 (1992) (declining to follow *Oregon* v. *Elstad*, 470 U.S. 298 [1985], as matter of State common law); *Opinion of the Justices*, 412 Mass. 1201, 1209-1211 (1992) (declining to follow *South Dakota* v. *Neville*, 459 U.S. 553 [1983], under art. 12). Cf. *Commonwealth* v. *A Juvenile*, 389 Mass. 128, 131 (1983).[4]

---

obtained at the unsupervised pleasure of the police.' *Mapp* v. *Ohio*, 367 U.S. 643, 685 (1961) (Harlan, J. dissenting). . . . In order to combat these pressures [i.e., the 'inherently compelling pressures' of custodial police interrogations] and to permit a full opportunity to exercise the privilege against self-incrimination, *the accused must be adequately and effectively apprised of his rights* and the exercise of those rights must be fully honored" (emphasis added).

*Id.* at 466-467.

[2]I agree with the court's conclusions relating to the 911 telephone calls.

[3]Article 12 of the Massachusetts Declaration of Rights provides in relevant part: "No subject shall . . . be compelled to accuse, or furnish evidence against himself." The Fifth Amendment to the United States Constitution, by contrast, states, "[N]or shall [any person] be compelled in any criminal case to be a witness against himself."

[4]In *Commonwealth* v. *A Juvenile*, 389 Mass. 128 (1983), this court noted

The court acknowledges that art. 12 has a broader scope than the Fifth Amendment with respect to the right against self-incrimination, and discusses the cases just cited as illustrating this principle. *Ante* at 291-292. But the court then concludes that we need not consider art. 12's wider protections, because (1) "the factors that led us in past cases to conclude that Federal law was insufficient to protect art. 12 rights are not present" (*ante* at 292); and (2) while we have sometimes rejected Federal precedent in favor of "bright-line rules in the Miranda context," (*ante* at 294), the rule the court adopts — the presence of counsel during a custodial interrogation and a prior opportunity to consult — *is* a bright-line one. Neither reason is correct.

With respect to the court's first reason, contrary to the court's view, our decisions make clear that art. 12 has substantive content independent of the Fifth Amendment, and that we depart from Federal law to give meaning to that content — not just, as the court would have it, because there is a "need to deter police from ignoring the requirements of *Miranda* where doing so would provide police with a greater chance of obtaining incriminating evidence." *Ante* at 292. We explored that substantive content, for example, in *Opinion of the Justices*, 412 Mass. at 1209-1211, and concluded that a statute permitting evidence of a refusal to take a breathalyzer test would violate art. 12 as compelled testimonial evidence, even though it could be admitted under the Fifth Amendment. Nothing in that case turned on the need to deter police interference with Miranda requirements.

that, although the Supreme Court had not, in *In re Gault*, 387 U.S. 1, 55 (1967), "specified a procedure for informing juveniles of their right against self incrimination, the Court . . . implied that some form of warning must be given and that the presence of an informed adult, either a parent or lawyer, to counsel the juveniles on their rights is an important factor in evaluating whether a knowing, intelligent, and voluntary waiver of these rights has occurred." *Commonwealth* v. *A Juvenile, supra* at 130-131. We then went beyond the Supreme Court and held as a matter of State law that "to demonstrate a knowing and intelligent waiver by a juvenile, in most cases [the Commonwealth] should show that a parent or an interested adult was present, understood the warnings, and had the opportunity to explain his rights to the juvenile so that the juvenile understands the significance of waiver of these rights" and that "in the case of juveniles who are under the age of fourteen . . . no waiver can be effective without this added protection." *Id.* at 134. In other words, we concluded that the presence of an interested adult *and* Miranda warnings are generally necessary to ensure that any waiver of the right against self-incrimination by a juvenile is effective.

Similarly, in *Attorney Gen.* v. *Colleton*, 387 Mass. at 795-796, we concluded that art. 12 demanded that any immunity from prosecution granted by the government to secure a witness's self-incriminating testimony be full transactional immunity, not the more narrow use or derivative use immunity deemed sufficient under the Fifth Amendment. Again, the court's "broader interpretation" of art. 12 sought to protect a substantive right, not to influence police behavior. *Id.* at 796.[5,6]

Inextricably connected to the expansive nature of the art. 12 right against "furnish[ing] evidence" against oneself is the concept of waiver — an issue obviously raised in this case, although not discussed by the court. Because the right to remain silent is a personal one, see *Moran* v. *Burbine*, 475 U.S. at 433 n.4; see also *United States* v. *Nobles*, 422 U.S. 225, 233 (1975), a waiver must be by the defendant himself, not just his counsel. *Commonwealth* v. *Edward*, 75 Mass. App. Ct. 162, 173 & n.13 (2009) (waiver of right to public trial must be by defendant, not only defendant's counsel on his behalf). Cf. *State* v. *Joseph*, 109 Haw. 482, 498 (2006) (interpreting Hawaii Constitution: "Since the right to remain silent is personal, it cannot be deemed waived simply because an attorney is present during interrogation").[7]

A waiver must be voluntary, knowing, and intelligent, and we

---

[5]See also *Commonwealth* v. *A Juvenile*, 389 Mass. at 131-134, discussed in note 4, *supra*, where our principal concern was not police overreaching, but the fact that a juvenile's inherent immaturity made it difficult, even with the standard Miranda warnings, to ensure that a juvenile "*is fully advised of and understands*" the constitutional rights against self-incrimination and to the assistance of retained or appointed counsel. *Id.* at 134-135.

[6]The court points to *Commonwealth* v. *Mavredakis*, 430 Mass. 848 (2000), as illustrating the point that we have imposed additional protections to prevent police from ignoring the requirements of *Miranda. Ante* at 292. In *Mavredakis*, however, we concluded that whatever might be true of the Fifth Amendment as interpreted by the Supreme Court in *Moran* v. *Burbine*, 475 U.S. 412 (1986), art. 12 required that police inform a suspect of an attorney's efforts to provide assistance because it was necessary to "actualize" the abstract right against self-incrimination. *Commonwealth* v. *Mavredakis, supra* at 860. While the court then added that taking any other approach would tacitly approve "police interference with the attorney-client relationship," *id.*, this latter point was an additional one, and not essential to the court's holding.

[7]In *State* v. *Vos*, 164 P.3d 1258 (Utah Ct. App. 2007), an intermediate appellate court found no ineffective assistance of counsel where the defendant's attorney informed police that the defendant had waived his Miranda rights,

" 'indulge every reasonable presumption against waiver' of fundamental constitutional rights," *Commonwealth* v. *White*, 374 Mass. 132, 137 (1977), aff'd (by an equally divided court), 439 U.S. 280 (1978), quoting *Johnson* v. *Zerbst*, 304 U.S. 458, 464 (1938), including the right against self-incrimination. The right not to furnish evidence against oneself unquestionably includes the right to say absolutely nothing in response to custodial police questioning — to remain silent. As the Court indicated in *Miranda* when discussing the Fifth Amendment — and it should be equally if not more true with respect to art. 12 — knowledge of this basic right is "the threshold requirement for an intelligent decision as to its exercise," *Miranda*, 384 U.S. at 468, and, concomitantly, as to its waiver. Similarly, an *intelligent* waiver of the right includes knowledge of the "consequences of forgoing it," because "[i]t is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise [or waiver] of the privilege." *Id.* at 469. See *Commonwealth* v. *Garcia*, 379 Mass. 422, 429 (1980) ("A confession can be voluntary in the legal sense only if the suspect actually understands the import of each Miranda warning"). Requiring police who interrogate a suspect in custodial circumstances to administer the Miranda warnings to the suspect *directly*, and to obtain that person's affirmative waiver, provides a basic level of assurance that the suspect understands his right against self-incrimination and has voluntarily, knowingly, and intelligently decided to waive it. See *id.* at 430. The rule the court adopts today removes this assurance.

I turn to the court's second reason for its ruling, that the safeguards the court adopts — requiring the presence of counsel and opportunity to consult — together qualify as a "bright-line" rule. They do not. While the physical presence or absence of a suspect's lawyer during custodial interrogation may be an unambiguous and easily ascertainable fact, the same cannot be said of "an opportunity to consult with the lawyer beforehand." *Ante* at 294. What constitutes an "opportunity to consult"? Is it

---

and presented the defendant to police to provide an inculpatory statement about the crime under investigation. In so concluding, the court implicitly ruled that waiver by counsel alone was sufficient. As indicated in the text, this has not been the rule in Massachusetts, at least with respect to other constitutional rights. See, e.g., *Commonwealth* v. *Edward*, 75 Mass. App. Ct. 162, 173 n.13 (2009).

enough if the suspect and the lawyer speak together for fifteen minutes? Ten? Five? One? Does it matter if the lawyer and the suspect have a prior relationship? Does it matter whether the lawyer has any training in criminal defense? It is clear that what *should* matter here is not the opportunity to consult but the actual consultation itself: have the lawyer and the suspect — the lawyer's client — discussed at least the client's right against self-incrimination and the possibility of waiver? However, there can be no inquiry into the nature or contents of the consultation because the attorney-client privilege forbids it. But if we have no ability to learn any details about the consultation, how can we have any confidence that the suspect has even been informed of his right not to incriminate himself, much less effectively waived it? At best, we are left with hypothesis or speculation about the state of the suspect's knowledge and understanding, a result against which the Court in *Miranda* specifically cautioned.[8]

This court has never had the occasion to consider requiring, as a separate matter of State law under art. 12, that *Miranda* warnings be given as a condition precedent to custodial police interrogation. See *Commonwealth* v. *Snyder*, 413 Mass. at 531. This case presents such an occasion. I would adopt, as a matter of our common law in order to actualize the guarantees of art. 12, a *true* bright-line rule that in every custodial interrogation, police must first administer Miranda warnings and obtain the suspect's own waiver of his right against self-incrimination, no matter whether counsel is also present, and no matter whether counsel and the suspect consulted beforehand. Unless the suspect has heard the warnings from the interrogator, no statement obtained as a result of the interrogation should be admitted in evidence.

The police have been administering Miranda warnings to suspects for more than forty years; doing so is an integral piece

---

[8]See *Miranda*, 384 U.S. at 468-469:

"The Fifth Amendment privilege is so fundamental to our system of constitutional rule and the expedient of giving an adequate warning as to the availability of the privilege so simple, we will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given. Assessments of the knowledge the defendant possessed, based on information as to his age, education, intelligence, or prior contact with authorities, can never be more than speculation; *a warning is a clearcut fact*" (footnote omitted) (emphasis supplied).

of proper police procedure. Cf. *Commonwealth* v. *Smith*, 412 Mass. at 836 ("The failure to administer the Miranda warnings as presently required by Federal law is itself an improper police tactic"). The warnings, and their administration, are clear and straightforward, and this clarity offers essential protection of a suspect's art. 12 rights. Because the court does not continue to require the warnings in every custodial police interrogation, I respectfully dissent.