COMMONWEALTH *vs.* DARRELL SMITH.

Suffolk. May 3, 2011. - August 12, 2011.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, & DUFFLY, JJ.

*Robbery. Joint Enterprise. Practice, Criminal,* Instructions to jury, Confronta-
tion of witnesses, Argument by prosecutor. *Evidence,* Joint enterprise,
Hearsay, Spontaneous utterance, Testimonial statement, Prior inconsistent
statement, Verbal completeness, Cumulative evidence. *Constitutional Law,*
Confrontation of witnesses.

At a criminal trial, the judge did not err in instructing the jury on joint ven-
ture, where, although the Commonwealth proceeded on the theory that the
defendant was the perpetrator of the crimes, the evidence at trial was suf-
ficient to support a finding of criminal liability as a joint venturer [389];
further, the judge's instruction in no way vouched for the Commonwealth's
theory of the case [389-390].
At a criminal trial, the judge did not abuse her discretion in determining that
an out-of-court statement made to police by an unavailable witness was
admissible under the spontaneous utterance exception to the hearsay rule
[390-391]; further, where it was apparent that the statement was made dur-
ing the course of an ongoing emergency and was therefore nontestimonial,
its admission in evidence did not violate the defendant's constitutional
right to confront the witnesses against him [391-395].
At a criminal trial, no substantial risk of a miscarriage of justice arose from
the failure to offer prior inconsistent statements made by a witness to the
defendant's investigator for the purpose of impeaching an out-of-court
statement by that witness, where the evidence of the defendant's guilt was
very strong. [396-397]
At a criminal trial, the exclusion of the defendant's complete statement to
police, even if error, did not prejudice the defendant's case, where the
excluded portion of the statement was cumulative of the admitted portions.
[397-398]
At a criminal trial, the prosecutor, in closing argument, did not improperly
vouch for the credibility of a witness's out-of-court statement. [398-399]

INDICTMENTS found and returned in the Superior Court Depart-
ment on September 6, 2006.

The cases were tried before *Elizabeth B. Donovan,* J.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.

*Anna E. Kalluri,* Assistant District Attorney, for the Commonwealth.

*Cathryn A. Neaves* for the defendant.

CORDY, J. On December 7, 2007, Darrell Smith was convicted of armed robbery, G. L. c. 265, § 17; possession of a firearm without a license, as a subsequent offender, G. L. c. 269, § 10 (*a*) and (*d*), and as an armed career criminal, G. L. c. 269, § 10G; and various other firearm offenses.[1] Although the Commonwealth had proceeded on the theory that Smith was the perpetrator of the crimes, the judge instructed the jury on joint venture liability, principally based on the presence of evidence that other persons also may have been involved. The Appeals Court reversed the convictions in an unpublished memorandum and order pursuant to its rule 1:28, concluding that there was insufficient evidence to support them under a theory of joint venture liability. *Commonwealth* v. *Smith,* 77 Mass. App. Ct. 1112 (2010). We affirm the convictions.

1. *The robbery of Trent Harvey.* The jury could have found the following sequence of events based on the evidence admitted at trial. At approximately 5 A.M. on May 7, 2006, Trent Harvey was driving on Blue Hill Avenue in the Dorchester section of Boston when he saw Elizabeth Splaine, a "streetwalker" with whom he was familiar. Splaine asked Harvey for a ride, and she made several calls on his cellular telephone before reaching her requested destination, at which she spent ten minutes before returning to the automobile. The two of them then drove to several additional locations, including a bank in Cambridge, from which Harvey withdrew $500 in twenty dollar denominations from an automated teller machine. Splaine was in the automobile when Harvey withdrew the money and placed it in the visor above his seat (so that it was not visible).

Harvey dropped Splaine at her mother's house, but Splaine held onto Harvey's cellular telephone to ensure that he would return to pick her up, which he subsequently did. They then

---

[1]The defendant also was indicted on two charges of assault with a dangerous weapon, G. L. c. 265, § 15B (*b*); and one charge of receiving stolen property, G. L. c. 266, § 60. The Commonwealth entered a nolle prosequi on the charge of receiving stolen property and on one of the assault charges. The other assault charge was dismissed by the judge as duplicative of the armed robbery charge.

drove to several other locations before Splaine asked to be taken to the corner of Wales Street and Harvard Street in Dorchester to meet a friend. She used Harvey's cellular telephone prior to and after making this request. While they were driving, a man called Harvey's cellular telephone and asked to speak with Splaine. During the call, she stated, "I'm on my way." Just before reaching the corner of Wales Street and Harvard Street, Splaine saw her friend, whom Harvey recognized as Mahogany Penn, a woman with whom he was also familiar. The defendant was standing with Penn. Harvey pulled the automobile over, and, from inside the automobile, Splaine began to speak with Penn and the defendant.

The defendant then opened the passenger door; Splaine got out of, and the defendant got into, the automobile. The defendant pulled a black, large-caliber gun from his waist and pointed it at Harvey's side, stating, "You know what this is. Drive." Harvey proceeded to drive, and the defendant took the chain that was around Harvey's neck, and the money that Harvey had secreted in the visor. Harvey then stopped the automobile, jumped out, and ran away. The defendant also got out of the automobile and ran away. Shortly thereafter, Harvey telephoned 911 and reported that he had been robbed.

At approximately 8:30 A.M., Boston police officers arrived in the area. On seeing the police, Harvey was initially reluctant to identify himself as the victim, because he was driving on a suspended license; and he did not want his wife to know he was with Splaine. Eventually, however, he spoke to the police, describing the defendant, Splaine, and Penn, but, because of his suspended license, not mentioning that he was robbed while seated in his automobile. Harvey also omitted the fact of his prior relationships with Splaine and Penn.[2]

[2]On the afternoon of the robbery, Harvey told a detective at the station that he had been robbed while walking; he again omitted the fact that he knew Splaine and Penn prior to the incident. He then identified the defendant, Splaine, and Penn in three separate photographic arrays. On May 13, 2006, Harvey gave a different version of events to the police at the police station. He admitted to lying about being robbed while walking. He stated that he had been in an automobile at the time. On May 15, Harvey gave a third statement, this time disclosing that he previously had "hung out" with Splaine and Penn. Finally, on May 25, Harvey gave a fourth statement to the police, admitting that he had met Splaine to have sexual relations on the day of the robbery.

While Harvey was speaking with police officers, Splaine walked out of the back of an apartment building at 37 Wales Street. Harvey identified Splaine as one of the women who robbed him, and the officers proceeded to detain her. Several minutes later, Penn came out of the apartment building, spoke briefly with Splaine, and then headed back into the building. Harvey identified her as the second woman involved in the robbery. One of the officers recognized Splaine from an incident to which he had responded at apartment 10, 37 Wales Street, one week earlier. During that incident, Splaine was present at the apartment along with another woman and a man who matched Harvey's description of the robber.

Based on this information, Sergeant Philip Owens and Officers John Puglia, Richard Ace, and Pat Malone entered the building located at 37 Wales Street and proceeded up to apartment 10. Sergeant Owens knocked on the door, announced, "Boston Police," and asked if anyone was home; there was no answer. As the officers began to leave the hallway, Penn quickly ran out of the apartment with her hands up. According to the officers, she appeared "visibly shaken," "very nervous," and "frantic." Penn stated, "He has a gun. He's wrapping it in a black sock."

Sergeant Owens pulled Penn away from the door and down the hallway, and the officers took cover in a stairway while pointing their guns at apartment 10's open threshold. Sergeant Owens announced their presence and ordered anyone inside to come out of the apartment. No one responded. The officers maintained their positions while Sergeant Owens escorted Penn out of the building (and into a police cruiser), and requested additional officers to the scene. The officers proceeded to evacuate the building, and eventually found the defendant on a rear balcony. After arresting the defendant, the police found a sock containing a loaded handgun on the ground, directly underneath the window of apartment 10.

On the execution of a search warrant, officers searched apartment 10 and recovered mail addressed to the defendant at 37 Wales Street, apartment 10; a document bearing Splaine's name; a baseball cap; two black jackets; and a pair of jeans. No money was found in the apartment; however, police seized $160 in

twenty dollar denominations from Splaine during the booking process. During an interview at the police station, and after receiving Miranda warnings, the defendant stated that he had no knowledge of the robbery and was sleeping when he heard loud bangs. He stated that Splaine and Penn had set him up.

2. *Discussion.* a. *Joint venture instruction.* During the defendant's trial, the Commonwealth proceeded on the theory that the defendant committed the armed robbery of Harvey. Nevertheless, evidence from which the jury properly could infer that Splaine had been involved was before the jury. Therefore, the judge instructed the jury on the elements of joint venture. The defendant did not object to the specific instruction, but now argues that it was error because the evidence at trial was insufficient to support a finding of criminal liability as a joint venturer rather than as a principal.

The issue is readily resolved. To determine whether a jury verdict is supported by sufficient evidence, we determine "whether the evidence received, viewed in a light most favorable to the Commonwealth, is sufficient so that the jury 'might properly draw inferences, not too remote in the ordinary course of events, or forbidden by any rule of law, and conclude upon all the established circumstances and warranted inferences that the guilt of the defendant was proved beyond a reasonable doubt.' " *Commonwealth* v. *Clary*, 388 Mass. 583, 588 (1983), quoting *Commonwealth* v. *Vellucci*, 284 Mass. 443, 445 (1933). With respect to joint venture liability:

> "[W]e will examine whether the evidence is sufficient to permit a rational juror to conclude beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime charged, with the intent required to commit the crime, rather than examine the sufficiency of the evidence separately as to principal and joint venture liability."

*Commonwealth* v. *Zanetti*, 454 Mass. 449, 468 (2009). Here, there was abundant evidence that the defendant knowingly participated in the robbery of Harvey.

Alternatively, the defendant argues that by repeatedly emphasizing the Commonwealth's theory that he was the principal

and Splaine was his joint venturer, the judge prejudiced his defense that he was not involved in the crime at all. This argument is without merit. The judge's instructions in no way vouched for the Commonwealth's theory of the incident; she clearly stated:

> "The Commonwealth is going forward with these indictments saying that they allege, and it will be up to you to make a determination, that [the defendant] participated as a joint venturer . . . in the armed robbery, so I'm going to explain to you what is meant by a joint venture."

Throughout her instruction, the judge was careful to explain what the Commonwealth was alleging, and that the Commonwealth was required to prove each element beyond a reasonable doubt. There was no error.

b. *Confrontation clause.* The Commonwealth was unable to locate Penn to testify at the trial. The judge allowed the Commonwealth's motion to admit her out-of-court statement: "He has a gun. He's wrapping it in a black sock." The defendant argues that because Penn's statement was made to police and the defendant did not have an opportunity to cross-examine her, admitting the statement violated the defendant's right of confrontation pursuant to the Sixth Amendment to the United States Constitution.[3] We conclude that Penn's out-of-court statement was made during the course of an ongoing emergency and was, therefore, nontestimonial. It was also admissible under the spontaneous utterance exception to the hearsay rule.

"The Sixth Amendment . . . guarantees that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . .' " *Commonwealth* v. *Lao*, 450 Mass. 215, 222 (2007), *S.C., ante* 12 (2011). Accordingly, Penn's hearsay statement is admissible only if (1) the statement is admissible under our common-law

---

[3]The defendant has not challenged the admission of the statement under art. 12 of the Massachusetts Declaration of Rights, which also protects the right to confrontation. The omission is of no consequence, however, because "in cases like this one involving the hearsay rule and its exceptions, we have always held that the protection provided by art. 12 is coextensive with the guarantees of the Sixth Amendment to the United States Constitution." *Commonwealth* v. *Lao*, 450 Mass. 215, 223 (2007), *S.C., ante* 12 (2011), and cases cited.

rules of evidence as an exception to the hearsay rule, and (2) the statement is nontestimonial for the purposes of the confrontation clause of the Sixth Amendment. See *Commonwealth* v. *Simon,* 456 Mass. 280, 295 (2010); *Commonwealth* v. *Nesbitt,* 452 Mass. 236, 243 (2008).

We turn first to the hearsay question. The judge's determination that Penn's statement qualified as a spontaneous utterance is entitled to great deference and will only be overturned if there was an abuse of discretion. *Commonwealth* v. *Simon, supra* at 296. A statement will be considered a spontaneous (or excited) utterance "if (1) there is an occurrence or event 'sufficiently startling to render inoperative the normal reflective thought processes of the observer,' and (2) if the declarant's statement was 'a spontaneous reaction to the occurrence or event and not the result of reflective thought.' " *Commonwealth* v. *Santiago,* 437 Mass. 620, 623 (2002), quoting 2 McCormick, Evidence § 272, at 204 (5th ed. 1999).

The judge's ruling was supported by the record and was not an abuse of discretion. Penn made the statement in response to observing the defendant's handling a gun within the confines of his apartment shortly after he had allegedly robbed Harvey at gunpoint, and as the police were knocking on the apartment door. Such an action viewed objectively is sufficiently startling to "negate[] premeditation." *Commonwealth* v. *Santiago, supra* at 625. Moreover, police testimony regarding Penn's outward demeanor as she fled the apartment — she was "visibly shaken," "very nervous," and "frantic" — reinforces the conclusion that her statement was spontaneous and that the instigating event had only just occurred. See *Commonwealth* v. *Beatrice, ante* 255, 258-259 (2011) (statement made during 911 call spontaneous utterance because caller "very upset and breathing heavily" and "reported that she had 'just' been assaulted").

We next turn to whether admission of Penn's statement violated the defendant's Sixth Amendment right to confront witnesses against him. In *Crawford* v. *Washington,* 541 U.S. 36, 53-54 (2004), the United States Supreme Court held that the confrontation clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-

examination." In *Davis* v. *Washington*, 547 U.S. 813, 822 (2006), the Court attempted to set forth a clear demarcation between testimonial and nontestimonial statements in circumstances such as that present here:

> "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."

The Court also reaffirmed that testimonial statements would be barred by the confrontation clause, while nontestimonial statements may be admissible. See *id.* at 821, quoting *Crawford* v. *Washington*, *supra.*

In its recent decision in *Michigan* v. *Bryant*, 131 S. Ct. 1143, 1158 (2011), the Court explained that determining whether an emergency exists "and is ongoing is a highly context-dependent inquiry," and expounded on the "primary purpose" test: "To determine whether the 'primary purpose' of an interrogation is 'to enable police assistance to meet an ongoing emergency,' which would render the resulting statements nontestimonial, we *objectively* evaluate the circumstances in which the encounter occurs and the statements and actions of the *parties*" (emphasis added). *Id.* at 1156, quoting *Davis* v. *Washington*, *supra.* Importantly, when determining the "primary purpose" of an interrogation, the guiding consideration is whether "the information the parties knew at the time of the encounter would lead a reasonable person to believe that there was an emergency, even if that belief [is] later proved incorrect." *Michigan* v. *Bryant*, *supra* at 1157 n.8. Thus, the "primary purpose" inquiry is divorced from the subjective or actual intentions of the individuals involved in a particular encounter. *Id.* at 1156.

The case of *Michigan* v. *Bryant*, *supra*, also enumerated a non-exhaustive list of circumstances to consider when determining

whether an emergency exists: (1) whether an armed assailant poses a substantial threat to the public at large, *id.* at 1158; (2) the type of weapon that has been employed, *id.* at 1158-1159; (3) the severity of the victim's injuries, *id.* at 1159; see *Commonwealth* v. *Simon, supra* at 299-300; (4) the formality of the interrogation, *Michigan* v. *Bryant, supra* at 1160; and (5) the involved parties' statements and actions. *Id.* Additional considerations include whether the victim's safety is at substantial imminent risk. See *Davis* v. *Washington, supra* at 832; *Commonwealth* v. *Galicia,* 447 Mass. 737, 745 (2006).

Here, the defendant argues that Penn's sudden exit from the apartment and her ensuing statement regarding the gun were not made in the course of an emergency, but, rather, were designed to "establish or prove past events potentially relevant to later criminal prosecution." *Davis, supra* at 822. In assessing the "primary purpose" of the doorway interrogation, the defendant urges the court to take an expansive view of the factual circumstances. Specifically, we are encouraged to consider both the doorway interrogation and the events occurring outside 37 Wales Street prior to the doorway encounter. The defendant surmises that, viewed objectively, the questioning of Splaine and Harvey's identification of Penn suggest the police harbored an investigatory motive when they knocked on apartment 10. Furthermore, he argues that Penn's initial emergence and subsequent reentry into 37 Wales Street established her awareness of the incipient police investigation and colored her motive for making the doorway statement: diverting police away from her own involvement in the robbery, while directing them toward the defendant.

We decline to adopt the defendant's argument for two reasons. First, it fails to recognize that Penn's response to the defendant's handling of the gun inside the apartment constituted the beginning of a new, albeit related, emergency.[4] It would be unwise to hold that once a police investigation has ensued, all

[4]On this point, we assume, without deciding, that the initial emergency incident to the robbery had come to an end on the arrival of the Boston police at 37 Wales Street. See *Davis* v. *Washington,* 547 U.S. 813, 829 (2006) (no ongoing emergency after police arrived at home, heard no arguments, and saw no violence). See also *Commonwealth* v. *Lao,* 450 Mass. 215, 226 (2007) (no ongoing emergency where defendant, after trying to run victim over with vehicle, left scene of accident). We need not decide this issue because, as explained below, the doorway encounter constituted an independent emergency.

subsequent events incident to that investigation are foresworn from qualifying as emergencies.[5]

Second, the defendant's argument fails to acknowledge the *Bryant* Court's directive that the "primary purpose" inquiry be objective. The parties' subjective motives or intentions are largely irrelevant. The question is not whether Penn actually intended her statements to serve a prosecutorial purpose, but whether reasonable participants in the parties' shoes would have believed an emergency was occurring.

Boston police officers knocked on the door of the apartment based on Harvey's identification of Penn and their knowledge of the occupants of the apartment from an earlier encounter.[6] Receiving no response, the police officers began to leave the building. At that moment, Penn emerged from the apartment looking "visibly shaken," "very nervous," and "frantic." She then blurted out, "He has a gun. He's wrapping it in a black sock."

We examine Penn's actions first. The fact that she did not answer the door immediately suggests that she was preoccupied by some unknown event. We will not speculate on the details of this private encounter. We know only that whatever occurred inside the apartment prompted Penn eventually to rush into the hallway. This and Penn's outward signs of anxiety are highly suggestive that she was trying to escape from someone or something.

Penn's statement is equally telling. Like the 911 caller in *Davis* v. *Washington*, 547 U.S. 813, 817-818 (2006), Penn made her statement while the event was unfolding rather than hours later, as in *Crawford* v. *Washington*, 541 U.S. 36, 65 (2004). *Davis* v. *Washington, supra* at 827. Notably, her present-tense

---

[5]The *Bryant* Court stressed that " 'a conversation which begins as an interrogation to determine the need for emergency assistance' can 'evolve into testimonial statements.' " *Michigan* v. *Bryant*, 131 S. Ct. 1143, 1159 (2011), quoting *Davis* v. *Washington*, 547 U.S. 813, 828 (2006). Here, we recognize the inverse proposition: a conversation that begins with a prosecutorial purpose may nevertheless devolve into nontestimonial statements if an unexpected emergency arises.

[6]At this juncture, had Penn answered the door and talked to the police officers about her involvement in the robbery without any intervening emergency, the primary purpose of the interrogation may have served a prosecutorial purpose, making her statements testimonial.

statement showed immediacy. *Id.* at 831. Moreover, Penn's statement did not identify the defendant by name. Rather, it only communicated the possibility of immediate danger to the police. See *id.* at 827. These objective indicia also indicate that this was an ongoing emergency.

We also examine the surrounding circumstances. *Michigan* v. *Bryant, supra* at 1156. Although the defendant was inside his apartment, the apartment door was open, exposing innocent neighbors to the whims of a gun-wielding suspect. *Id.* at 1158. Similarly, it is significant that the weapon at issue was a firearm that could have been used against police with lethal force. *Id.* at 1158-1159. Further, the statement was informal and not prompted by police questioning. *Id.* at 1160. At the moment Penn emerged from the apartment, the police had already turned to leave, and they reinserted themselves into the situation for the sole purpose of meeting the potential new threat. The officers pulled Penn to safety, drew their weapons, aimed them on the door, called for backup, and prepared for a possible confrontation. See *Davis* v. *Washington, supra* at 817-818. Finally, the whereabouts of the suspect were unknown. *Michigan* v. *Bryant, supra* at 1156. The police did not know whether he was edging toward the apartment door or edging toward the balcony.

We reject the defendant's argument that Penn's statement "essentially created the emergency, and the actual existence of that emergency is subject to no small amount of skepticism." This argument presumes that Penn had the foresight to stage an impromptu emergency so that her statements might later survive a confrontation clause challenge. We think this too attenuated. Moreover, the defendant fails to credit the *Bryant* Court's holding that we must "evaluate the circumstances in which the encounter occurs and the statements and actions of the *parties*" (emphasis added). *Bryant, supra* at 1156. While Penn's actions are certainly relevant, we must also view the situation from the perspective of the attendant police officers. As discussed above, an objective police officer would view the events occurring inside 37 Wales Street as an "ongoing emergency."

Where it is apparent that Penn's statement qualifies as spontaneous utterance and was nontestimonial, it was not error to admit it at trial.

c. *Exclusion of Penn's statement to defendant's investigator.*
The defendant argues that the judge erred by refusing to allow
him to impeach Penn's spontaneous utterance with prior incon-
sistent statements Penn made to the defendant's investigator,
specifically, that she never made the spontaneous utterance at-
tributed to her by police. During pretrial discussions of motions
in limine, the judge indicated that she had doubts about the
admissibility of the statement taken by the investigator; however,
she declined to rule at that time and asked defense counsel to
make an offer of proof after Penn's statement to police was of-
fered and admitted. Defense counsel agreed to proceed accord-
ingly, but never sought during trial to admit the prior inconsistent
statement. The issue is therefore unpreserved, and we review to
determine whether the error, if any, created a substantial risk of
a miscarriage of justice. See *Commonwealth* v. *Randolph,* 438
Mass. 290, 293-295 (2002).

The Commonwealth concedes, as it must, that the statement
would have been admissible if offered by the defendant. See
*Commonwealth* v. *Mahar,* 430 Mass. 643, 648-649 (2000) (state-
ments not hearsay; admissible because they are not offered for
truth, but to impeach witness). See Mass. G. Evid. § 806 (2011).
However, even though exclusion of Penn's prior inconsistent
statement would have constituted error had the defendant prop-
erly offered it, the failure to offer it did not create a substantial
risk of a miscarriage of justice because evidence of the defend-
ant's guilt was very strong.

"An error creates a substantial risk of a miscarriage of justice
unless we are persuaded that it did not 'materially influence[]'
the guilty verdict. . . . In making that determination, we con-
sider the strength of the Commonwealth's case against the defend-
ant (without consideration of any evidence erroneously admit-
ted), the nature of the error, whether the error is 'sufficiently
significant in the context of the trial to make plausible an infer-
ence that the [jury's] result might have been otherwise but for
the error' . . . ." (Citations omitted.) *Commonwealth* v. *Alphas,*
430 Mass. 8, 13 (1999). The statement allegedly made to the
defense investigator, if admitted, may have impeached the cred-
ibility of Penn's spontaneous utterance, which bore on the issue
of the defendant's possession of a gun in the apartment. However,

three police officers testified that they were present and heard her statement. Moreover, even without Penn's spontaneous utterance, there was more than sufficient evidence for the jury to infer that the defendant possessed the gun that was used to rob Harvey. Harvey testified that the defendant, whom he later identified in a photographic array, pointed a large caliber black gun at him and took his gold chain and cash. During a search of the apartment building, police found a black large caliber gun below the window of apartment 10, and found letters in the apartment addressed to the defendant at 37 Wales Street, apartment 10. Any impeachment value of the inconsistent statement would have been diminished by the testimony of the police officers and the undisputed evidence that a gun in a black sock was in fact found outside and under the window of the apartment, thereby corroborating Penn's spontaneous utterance.

d. *Exclusion of defendant's complete statement to police.* Next, the defendant argues that the judge abused her discretion where the Commonwealth introduced the entirety of the defendant's responses to police questioning, save the last response, and she excluded, over the defendant's objection, the final portion of the statement he made in response to police questioning. Specifically, the judge allowed the Commonwealth to introduce the defendant's statements made to police that (1) he had no knowledge of what was going on and was sleeping when he heard loud bangs; (2) he went out to the balcony of his apartment, saw the police, asked what was going on, and his two female friends were in the apartment; (3) he dated both Splaine and Penn, who set him up; (4) the officers would not find any guns or ammunition in his apartment; (5) the officers might find a small amount of drugs and paraphernalia; and (6) "[e]verybody has guns" (when asked whether he ever possessed a firearm), but also allowed the Commonwealth's motion in limine to exclude the defendant's further statement that he "ain't robbed nobody" in response to a question the police asked about the robbery.

"The rule of verbal completeness precludes a party from presenting a fragmented and misleading version of events by requiring the 'admission of other relevant portions of the same statement or writing which serve to "clarify the context" of the

admitted portion.' *Commonwealth* v. *Carmona*, 428 Mass. 268, 272 (1998) . . . . 'The rule applies when the defendant's statement is (1) on the same subject as the admitted statement; (2) part of the same conversation as the admitted statement; and (3) necessary to the understanding of the admitted statement.' " *Commonwealth* v. *Garrey*, 436 Mass. 422, 436 (2002), quoting *Commonwealth* v. *Clark*, 432 Mass. 1, 14 (2000). See Mass. G. Evid. § 106 (2011). Here, the statement should have been admitted because it was part of the same questioning and would have clarified that the questioning related to the robbery of Harvey. However, we need not decide whether the judge's ruling excluding the evidence amounted to an abuse of discretion because its exclusion did not prejudice the defendant's case. The excluded portion of the statement was cumulative of the admitted portions in which the defendant denied having any idea why the police were at the apartment, and professed that he was sleeping until he heard loud bangs. The exclusion of cumulative evidence rarely constitutes prejudicial error, see *Commonwealth* v. *Rawlins*, 352 Mass. 293, 295 (1967), and we find none here.

e. *The prosecutor's closing argument.* Finally, the defendant argues that the prosecutor improperly vouched for the credibility of the police officers who testified and, by implication, improperly vouched for the credibility of Penn's out-of-court statement. The defendant made no objection to the prosecutor's closing argument at trial; therefore, we review to determine whether there was error, and, if so, whether the error created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Randolph*, 438 Mass. 290, 293-295 (2002).

In closing, defense counsel asked the jury: "Are you going to believe anything [Penn] said to the officer? Are you going to believe anything that she says about a gun with a black sock?" In response, the prosecutor stated in closing that three officers testified to Penn's statement, and then he argued:

"Why would the officers make that up? If they were to make up something, wouldn't it be easier to just have the gun in the apartment where [the defendant] — where we know he was? A gun in a sock, where the officers told you

later was found just outside the window of the apartment. [Defense counsel] was suggesting that they were making that up or you didn't have to believe Mahogany Penn's statement. But, if you were going to go that route, isn't it easier to just put the gun in the apartment?"

The Commonwealth concedes that the prosecutor's statement that "[Defense counsel] was suggesting that [the police] were making [Penn's statement] up," was inaccurate. Notwithstanding this inaccuracy, nothing in the prosecutor's closing statement creates a substantial risk of a miscarriage of justice. While a prosecutor may not vouch for the truthfulness of a witness's testimony, *Commonwealth* v. *Ciampa*, 406 Mass. 257, 265 (1989), we consistently have held that, where the credibility of a witness is an issue, counsel may "argue from the evidence why a witness should be believed." *Commonwealth* v. *Raposa*, 440 Mass. 684, 694-695 (2004).

Here, the prosecutor referred to the reasons the jury should credit Penn's statement, including the number of police officers who testified to having heard the statement and the corroborating evidence that a gun inside a black sock was found outside the defendant's apartment window. At no time did the prosecutor indicate that he had a personal belief or knowledge that the police officers were testifying truthfully. Further, the judge's instruction to the jury that "it's going to be up to you to decide who's telling the truth. No one can vouch for the credibility of any witness," would negate any potential risk of prejudice. See *Commonwealth* v. *Mitchell*, 428 Mass. 852, 857-858 (1999) (improper closing remarks "adequately offset by the judge's careful and clear instructions describing the role of closing argument").

3. *Conclusion.* For the foregoing reasons, the defendant's convictions are affirmed.

*So ordered.*