NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12742


COMMONWEALTH  vs.  SKYE A. McGANN.



Franklin.     November 7, 2019. - March 17, 2020.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher, &
Kafker, JJ.


Assault and Battery.  Assault and Battery by Means of a
     Dangerous Weapon.  Constitutional Law, Confrontation of
     witnesses, Fair trial.  Evidence, Hearsay, Spontaneous
     utterance, Medical record, Cross-examination.  Practice,
     Criminal, Hearsay, Confrontation of witnesses, Fair trial,
     Restitution.  Fair Trial.  Due Process of Law, Fair trial.
     Self-Defense.  Restitution.




     Complaint received and sworn to in the Orange Division of
the District Court Department on January 17, 2017.

     A pretrial motion to redact medical records was heard by
Paul H. Smyth, J., and the case was tried before David S. Ross,
J.

     The Supreme Judicial Court granted an application for
direct appellate review.


     Cara M. Cheyette for the defendant.
     Nicholas Shareef Atallah, Assistant District Attorney
(Thomas H. Townsend, Assistant District Attorney, also present)
for the Commonwealth.

CYPHER, J. This is an appeal by the defendant, Skye A. McGann, from her convictions of assault and battery on a family or household member and assault by means of a dangerous weapon. We granted her application for direct appellate review. Before trial, the victim, the defendant's then boyfriend, invoked his privilege against self-incrimination under the Fifth Amendment to the United States Constitution and therefore did not testify at trial. The defendant argues on appeal that, for various reasons, her right to a fair trial was violated and that the judge improperly ordered the defendant to pay restitution to the victim's mother, who was a third party and nonvictim. To determine whether the defendant received a fair trial, we address whether (1) the trial judge properly admitted the victim's statements he made over the telephone to his mother; (2) a judge who heard the defendant's pretrial motion to redact the victim's medical record (motion judge) properly admitted a statement contained in that record; (3) a line of questioning by the Commonwealth during cross-examination of the defendant was improper and, if so, whether it created a substantial risk of a miscarriage of justice; and (4) the evidence presented by the Commonwealth was sufficient to allow a reasonable jury to conclude that the defendant did not act in self-defense. We hold that the defendant received a fair trial and that a trial judge may order a defendant to pay restitution to a third party

in certain circumstances.  We therefore affirm the defendant's

convictions and the judge's restitution order.

Background.  We recite the facts as the jury could have

found them, reserving certain details for later discussion.

1.  The incident.  The defendant and the victim lived

together in an apartment (apartment).  At some time during the

night of January 15, 2017, the defendant and the victim got into

an argument.[1]  Around 11 P.M., the victim called his mother

(first telephone call).  The victim's mother testified[2] that the

victim told her, "[The defendant] just punched me in both of my

eyes.  I can barely see."  The victim's mother described the

victim's tone of voice as "screaming and crying."  She testified

that when she told the victim to call the police, he responded,

"I'm gonna call the cops."[3]  The victim's mother called the

police several times after speaking with her son.

At some point after the first telephone call, the defendant

left the apartment and drove to her father's house.  The

---

[1] A neighbor testified at trial that she heard "banging," "slamming," and "yelling" around 11 P.M., coming from the apartment.

[2] As will be discussed in more detail infra, the judge accepted the victim's assertion of his privilege under the Fifth Amendment to the United States Constitution and he therefore did not testify at trial.

[3] There is no evidence in the record to suggest that the victim called the police at any point during the incident at issue.

victim's mother testified that after the first telephone call, she called the defendant to address the victim's accusations. The victim's mother testified that when she told the defendant, "[The victim] told me you beat him up pretty bad and you stole his car," the defendant responded, "You should see what he did to me." The defendant spent about an hour at her father's house and then returned to the apartment. After the defendant returned to the apartment, the police arrived at the apartment, spoke to the victim, and left thereafter.

At 1:30 A.M. on January 16, the victim again called his mother (second telephone call). The victim's mother testified that during this telephone call, the victim was "screaming," "[h]e was crying," and his tone of voice was "hysterical." She testified that the victim said to her, "She tried to kill me. She pulled out a knife." A neighbor living in the apartment next to the victim and defendant testified that around 1:30 A.M. she heard[4] the defendant state, "I'm going to kill you, and I want you dead," from the apartment. Another neighbor testified that during the night she heard the defendant state, "I'm gonna F'ing kill you," from the apartment.

---

[4] The neighbor testified that she could hear things from the apartment occupied by the victim and the defendant "very clear[ly]" and that she is able to recognize the defendant's voice.

As the victim concluded the second telephone call with his mother, the police arrived.  When Officer Corey Brown and Sergeant Randall Stange of the Athol police department arrived at the scene, they observed blood on the back of the victim's head.  Brown testified that he noticed blood around the victim's mouth and nose and bite marks on the victim's arm and shoulder, and that the victim's demeanor was "excited," his voice was "loud," and he was "very boisterous with his hands."  Both officers testified that they did not observe injuries or marks on the defendant.  The victim was transported to the hospital by ambulance.

As detailed infra, the defendant testified at trial, raising the issue of self-defense.

2.  Evidentiary holdings.  As relevant to the defendant's appeal, the judge accepted the victim's assertion of Fifth Amendment privilege, allowed the Commonwealth's motion to admit statements the victim made to his mother on the telephone as nontestimonial spontaneous utterances, and denied the defendant's motion to redact certain statements in the victim's medical records.

3.  The restitution order.  After the verdicts, the prosecutor requested, inter alia, that the defendant pay

restitution.  At a later restitution hearing, the judge ordered the defendant to pay restitution to the victim's mother.[5]

The defendant appealed from her convictions and from the restitution order, and we granted her application for direct appellate review.

Discussion.  1.  Admissibility of the victim's statements to his mother.[6]  We first address whether the trial judge properly admitted the statements the victim made over the telephone to his mother.  The defendant argues that the victim's statements were testimonial because he knew or should have known that his statements were translating into police action.  She further argues that the judge should not have admitted the victim's statements to his mother as spontaneous utterances because the statements failed to bear sufficient indicia of reliability.  She encourages this court to "take this opportunity to revisit [Commonwealth v. King, 436 Mass. 252 (2002),] and to empower and, indeed, require, that judges act as 'engaged gatekeepers' to ensure that the presumptive reliability of spontaneous utterances offered without benefit of confrontation is not rebutted by other credible, reliable

---

[5] The defendant satisfied the payment of restitution.

[6] In her brief, the defendant challenged the victim's invocation of his Fifth Amendment privilege, but at oral argument, she stated that she was no longer asserting this as an independent argument.

evidence."[7]  The Commonwealth contends that the victim's

statements to his mother were not testimonial because they were

all made to resolve ongoing medical emergencies, and that "the

limitations required by Commonwealth v. King did not violate the

defendant's due process rights, as the court still evaluated the

statements themselves for reliability."  For the reasons that

follow, we hold that the judge properly admitted the statements

the victim made to his mother as excited utterances.

a.  Confrontation clause.  The first issue is whether the

confrontation clause barred the victim's out-of-court statements

to his mother from being admitted.  In a criminal case, to be

admissible as a spontaneous utterance, the out-of-court

statement made by a declarant who does not testify at trial must

satisfy the confrontation clause and must be admissible pursuant

to the rules of evidence.[8]  See Commonwealth v. Beatrice, 460

---

[7] The defendant does not argue that the excited utterance
exception be abandoned, "just that its application comport with
due process."

[8] "A statement qualifies as a spontaneous utterance if
'there is an occurrence or event "sufficiently startling to
render inoperative the normal reflective thought processes of
the observer"' and 'the declarant's statement was "a spontaneous
reaction to the occurrence or event and not the [result] of
reflective thought."'" Commonwealth v. Simon, 456 Mass. 280,
296, cert. denied, 562 U.S. 874 (2010), quoting Commonwealth v.
Santiago, 437 Mass. 620, 623 (2002).  See Mass. G. Evid.
§ 803(2) (2020).  The parties do not dispute that the victim's
statements meet this test, and given the testimony of the
victim's mother and Brown regarding the victim's demeanor,
discussed infra, we agree.

Mass. 255, 258 (2011). The confrontation clause bars the admission of testimonial hearsay by a declarant who does not appear at trial, unless the declarant is unavailable to testify as a matter of law and the defendant had an earlier opportunity to cross-examine him or her. See id., citing Crawford v. Washington, 541 U.S. 36, 53-54 (2004). "Testimonial statements are those made with the primary purpose of 'creating an out-of-court substitute for trial testimony'" (citation omitted).[9] Commonwealth v. Wardsworth, 482 Mass. 454, 464 (2019). "[T]he question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" Ohio v. Clark, 135 S. Ct. 2173, 2180 (2015), quoting Michigan v. Bryant, 562 U.S. 344, 358 (2011). "[W]hen the Commonwealth in a criminal case seeks to admit the excited utterance of a declarant who is not a witness at trial . . . , the judge should conduct a careful voir dire, evidentiary if needed, before admitting the excited utterance in evidence." Commonwealth v. Hurley, 455 Mass. 53, 68 n.14 (2009). "We accept the judge's findings of fact unless clearly erroneous but independently apply constitutional principles to the facts found."

---

[9] In Commonwealth v. Wardsworth, 482 Mass. 454, 464 n.18 (2019), we clarified that the "appropriate method of analysis is the 'primary purpose' test."

Commonwealth v. Simon, 456 Mass. 280, 296, cert. denied, 562 U.S. 874 (2010).

The judge conducted a voir dire, before the trial, during which the victim's mother and a police officer who responded to the scene testified. See Hurley, 455 Mass. at 68 n.14. The victim's mother testified during the voir dire that at approximately 11 P.M. on January 15, the victim called her and said that the defendant punched him in both his eyes, that he could "barely see," and that the defendant stole his car. The victim's mother further testified that during this telephone call, the victim was "very, very, very upset," and that he was "crying," "screaming," and "hysterical." She said she told him to call the police and that he responded, "I will." There is no evidence to suggest that the victim called the police, and the defendant does not argue that he did so.

The victim called his mother a second time, again conveying the defendant's actions to his mother. The victim's mother testified during voir dire that the victim called her around 1:30 A.M. on January 16 and told her, "[The defendant] pulled out a knife. She's tried to kill me." She testified that during this second telephone call, the victim was "screaming," and his tone of voice was "hysterical" and "much worse" than the tone of his voice on the first telephone call. The judge ruled that the statements were nontestimonial, explaining that they

"were not made for the purpose of aiding an investigation of prosecution of a crime.  That might have been so had he called the police, but he was calling his mother; it sounds as if in despair."

The record before us demonstrates that a reasonable person in the victim's position would not have anticipated that his statements to his mother in the first telephone call would be used against the defendant in a prosecution.  See Commonwealth v. Smith, 460 Mass. 385, 394 (2011); Beatrice, 460 Mass. at 258-259.  Although his mother urged him to call the police, there is no evidence that he did so, nor is there evidence that the victim's mother informed the victim that she was going to contact the police, or that she was attempting to gather information from the victim in order to communicate that information to the police.  See Smith, supra; Beatrice, supra.

The statements the victim made to his mother during the second telephone call present us with an additional layer of information:  that after his first call to his mother and before his second call to his mother, the police responded to the apartment and spoke with the victim.  The defendant argues that the victim knew or should have known that his second telephone call to his mother would result in the police again responding to his apartment, and that it is immaterial that the police arrived on scene during the second telephone call in response to

a 911 call from a neighbor.[10]  However, as mentioned supra, there is no evidence in the record to suggest that, during the first call, the victim's mother told the victim that she was planning to contact the police.  The record reflects that on the second telephone call, the victim was "screaming" and "hysterical," and that when the police arrived as he finished the second telephone call, a police officer[11] observed the victim to be "covered in blood," and "pretty frantic."  Therefore, the victim's state of being, combined with the record being void of an indication that he was aware his mother was doing anything other than just listening to his concerns regarding the defendant, leads us to hold that the statements in the second telephone call also were not testimonial.  See Beatrice, 460 Mass. at 258-259.  As such, the victim's statements to his mother were nontestimonial and the admission of the statements did not violate the confrontation clause.  See id. at 258.

---

[10] The victim's mother testified during voir dire that she called the police multiple times between the first and second telephone calls with her son, to report that she had concerns about her son.

[11] Brown testified during the voir dire that when he arrived on scene at around 1:45 A.M. on January 16, the victim got out of the vehicle he was sitting in, was "covered in blood," and had blood coming from his nose and mouth area; that the blood was wet; and that the victim had bite marks on his arms and one bite mark on his shoulder.  Brown also testified that the victim "was pretty frantic," his tone of voice was "excited," and the volume of his voice "was pretty loud."

b.  Due process.  The second issue regarding the admissibility of the victim's statements to his mother is whether, as the defendant argues, her due process right to a fair trial was violated because the judge did not consider all the evidence in determining the admissibility of the victim's out-of-court statements to his mother.  While a judge has "broad discretion" to determine whether a statement meets the foundational criteria of the spontaneous utterance exception, Simon, 456 Mass. at 296, we held in King that the judge does not have discretion to exclude a spontaneous utterance that meets the foundational criteria "on the ground that, in light of other evidence, the statement no longer appears reliable."  King, 436 Mass. at 256-257 (if judge had independent discretion to determine reliability of evidence in light of other evidence, this would "effectively require the judge to hear the entirety of the other proposed trial evidence and would have the judge usurp the fact finder's function").  Underlying our holding in King was the principle that spontaneous utterances are, by their very nature, considered reliable and that the reliability of a spontaneous utterance goes to its weight, not its admissibility. Id.  Although decided before Crawford, 541 U.S. 36, King does not conflict with Crawford's holding, or with our Commonwealth's subsequent case law.  As such, we decline the defendant's invitation to revisit King.  As the admission of the victim's

statements as spontaneous utterances complied with evidentiary standards, the admission of the victim's out-of-court statements did not violate the defendant's due process right to a fair trial.

2. Admissibility of the statement contained in the victim's medical record. The next issue is whether the motion judge properly admitted the following statement contained in the victim's medical record: "repeatedly beat him about the head/face and bit him several times in arms and also came after him with steak knife."[12] The defendant contends that the statement in the victim's medical record in which he "describ[es the] defendant as the assailant on a charge involving only a threat of injury was inadmissible, testimonial hearsay."[13] The Commonwealth argues that the judge properly admitted the statement as a statement related to the victim's medical history because it related to possible causes of the injuries for which he was receiving treatment. We hold that the motion judge properly admitted the statement contained in the victim's medical record.

---

[12] Information that may have named the defendant as the subject of this statement was redacted in the medical record.

[13] Before trial, the Commonwealth stated that the charge of assault and battery was never filed.

Certified medical records "may be admitted by the court, in its discretion, as evidence in the courts of the commonwealth so far as such records relate to the treatment and medical history of such cases . . . but nothing therein contained shall be admissible as evidence which has reference to the question of liability."  G. L. c. 233, § 79.  See Mass. G. Evid. § 803(6)(B) (2020).  "The statute has long been construed to permit the admission of a record that relates directly and primarily to the treatment and medical history of the patient, 'even though incidentally the facts recorded may have some bearing on the question of liability.'"  Commonwealth v. Torres, 479 Mass. 641, 653 (2018), quoting Commonwealth v. Dube, 413 Mass. 570, 573 (1992).  See Commonwealth v. Dargon, 457 Mass. 387, 395 (2010), quoting Commonwealth v. DiMonte, 427 Mass. 233, 242 (1998) ("We distinguish, however, 'a conclusory fact central to the jury's inquiry from physical observations from which inculpatory inferences flow'" [quotations omitted]).

Here, the motion judge ruled that the statement was admissible, nontestimonial hearsay.  The victim's mother read the statement during her testimony at trial, and the prosecutor read the statement during closing argument.

The first part of the statement, "repeatedly beat him about the head/face and bit him several times in arms," falls within the medical record exception because it relates to a potential

cause of the victim's "multiple bite marks," "bloodied appearance," and contusion. See G. L. c. 233, § 79; Torres, 479 Mass. at 653, quoting Dube, 413 Mass. at 573. The second part of the statement, "came after him with steak knife," although a closer call than the first part of the statement, was also admissible. Given that the victim's injuries included lacerations on his back, face, and finger, the second part of the statement in the medical record was a "fact-specific reference[] to the reported cause of [his] injuries [and was] part of [his] medical history and [was] relevant to treatment." DiMonte, 427 Mass. at 242. Therefore, the motion judge properly admitted the statement contained in the victim's medical record.[14]

3. Prosecutor's cross-examination of the defendant. We next examine whether a line of questioning by the prosecutor during cross-examination of the defendant was improper and, if so, whether it created a substantial risk of a miscarriage of justice. The defendant argues that the prosecutor "asked a long series of 'improperly loaded question[s]'" on cross-examination of the defendant, and that the prosecutor did not have a good faith basis for the questions. The Commonwealth agrees that the

---

[14] Because statements properly admitted under the medical record exception are nontestimonial, we reject the defendant's confrontation clause argument. See Commonwealth v. Irene, 462 Mass. 600, 618, cert. denied, 568 U.S. 968 (2012).

questions were improper, but argues that no substantial risk of a miscarriage of justice occurred because the prosecutor did not refer to the line of inquiry during closing argument and there was substantial evidence to support the Commonwealth's case.  We conclude that the majority of the subject line of questioning was improper but that it did not create a substantial risk of a miscarriage of justice.

"A cross-examiner may ask a question that implies the truth of a proposition if she has a basis in fact for asking the question and is prepared to disclose that reason to the judge." Commonwealth v. Christian, 430 Mass. 552, 561 (2000), overruled on another ground by Commonwealth v. Paulding, 438 Mass. 1 (2002).  "There must be a reasonable and good-faith basis for questions asked on cross-examination."  Mass. G. Evid. § 611(b)(1) (2020).  Even when a prosecutor has a good faith basis for asking questions on cross-examination, the questioning should be curtailed in the face of a witness's consistent denials.  Christian, supra at 562.

In Commonwealth v. Peck, 86 Mass. App. Ct. 34, 39 (2014), the Appeals Court stated that "the requirement noted in [Commonwealth v. White, 367 Mass. 280, 285 (1975)] (that the examiner must have a good faith basis and proper foundation for cross-examination) is simply another way of saying that the examiner must have a reasonable belief that the facts implied by

the questions could be established by admissible evidence." The court in Peck went on to hold that although the prosecutor communicated to the judge that he had a report in which the defendant's boyfriend told the police and the insurance fraud bureau that the defendant had confessed to her involvement in insurance fraud, the prosecutor's cross-examination questions to the defendant about that conversation were improper. See Peck, supra at 37-40. The court held that the questioning was improper because the boyfriend was not present to testify and therefore "the prosecutor's questions had the effect of informing the jury of the contents of out-of-court statements allegedly made by the defendant that were not admissible" because (1) the boyfriend could have testified but did not and (2) on cross-examination the defendant denied making the statements. See id. at 39-40. The ruling in Peck, however, goes too far in limiting a prosecutor's cross-examination, as the cross-examiner need not be ready to offer admissible evidence in support of a question. See Mass. G. Evid. § 611(b)(1) & note, citing White, 367 Mass. at 284.

The defendant in the present case did not object to the questioning, and we therefore review for a substantial risk of a miscarriage of justice. See Commonwealth v. Carroll, 439 Mass. 547, 554 (2003). This standard requires us to determine "if we have a serious doubt whether the result of the trial might have

been different had the error not been made." Commonwealth v.

Azar, 435 Mass. 675, 687 (2002), S.C., 444 Mass. 72 (2005),

quoting Commonwealth v. LeFave, 430 Mass. 169, 174 (1999).  In

making this determination, "[w]e consider the strength of the

Commonwealth's case, the nature of the error, the significance

of the error in the context of the trial, and the possibility

that the absence of an objection was the result of a reasonable

tactical decision."  Azar, supra.

During cross-examination of the defendant, the prosecutor

asked the defendant a series of questions[15] relating to her

---

[15] The line of questioning at issue was as follows:

Q.:  "And that wound was actually caused by the tip of the
knife that you grabbed, correct?"

A.:  "No."

. . .

Q.:  "Before you left -- you in fact had kicked [the
victim] and hit him in the face before you took his car and
left, correct?"

A.:  "No."

Q.:  "And then, when you returned and you -- the argument
resumed, you yanked [the victim] out of bed, and you threw
him up against that mirror, correct?"

A.:  "No.  I never even --"

Q.:  "And in fact --"

A.:  "-- touched him."

grabbing the knife, kicking the victim, throwing him into a mirror, and breaking down a door; the defendant denied doing any of the actions about which the prosecutor questioned her. Although the Commonwealth agrees with the defendant that this questioning was improper, we must still decide the issue. See Commonwealth v. Poirier, 458 Mass. 1014, 1015 (2010), quoting Sibron v. New York, 392 U.S. 40, 58 (1968) ("Confessions of error are, of course, entitled to and given great weight, but they do not 'relieve this Court of the performance of the judicial function'"); Commonwealth v. McClary, 33 Mass. App. Ct. 678, 686 n.6 (1992), cert. denied, 510 U.S. 975 (1993).

------

Q.:  " -- he then ran into the bathroom with your phone after you threw him into the mirror, correct?"

A.:  "No."

Q.:  "And then --"

A.:  "Are you trying to throw me off?"

Q.:  "And then you broke down the door while he was in there with your phone, correct?"

A.:  "Wait, what?"

Q.:  "You broke down the door while he was in there with your phone, correct?"

A.:  "No, I can't even break down a door."

Q.:  "And then, when you grabbed the knife, he put his right arm up, didn't he?"

A.:  "No."

The Commonwealth stated in its brief that the questions were based on the prosecutor's notes from a conversation he had with the victim and the victim's mother, which were provided to defense counsel before trial. However, because the victim did not testify at trial, the victim's statements to the prosecutor during that conversation were not going to be admitted as evidence during the trial. Because the prosecutor based his questions during this line of cross-examination on his conversation with the victim, he did have a good faith basis to ask the questions, even though he was not going to offer substantive evidence of the statements. See White, 367 Mass. at 284. However, although the prosecutor had a good faith basis for asking the defendant the questions, he should have ceased the line of questioning in the face of the defendant's consistent denials. See Christian, 430 Mass. at 562.

The improper line of questioning did not create a substantial risk of a miscarriage of justice because it was brief, the line of questioning did not receive substantial attention at trial, the prosecutor did not mention his questions or the defendant's answers in his closing argument, and the defendant answered each question with a denial. See Azar, 435 Mass. at 687. Furthermore, although the defendant did not object to the questioning and the judge did not provide a contemporaneous curative instruction, the judge gave a general

curative instruction before the trial, explaining that "what a lawyer says is not evidence unless a witness agrees to it," and in his final instruction he explained that "[a] question by itself is not evidence, the evidence is the witness['s] answer taken in context."  See Commonwealth v. Imbert, 479 Mass. 575, 587 (2018) (juries expected to follow judge's instructions). For the foregoing reasons, although the line of questions was improper, it did not create a substantial risk of a miscarriage of justice.[16]  See Carroll, 439 Mass. at 554.

4.  Defendant's self-defense claim.  The next issue is whether the evidence presented by the Commonwealth was sufficient to allow a reasonable jury to conclude that the

---

[16] In addition, the prosecutor's statements during his closing argument were not improper.  The prosecutor stated, "[Y]ou have to decide on the credibility of the witnesses you heard today.  And I argue to you, if there's one thing you know from this trial, you know whatever happened in that house didn't go down the way [the defendant] said it did.  Because her story is full of holes, it's full of unbelievable things.  It doesn't make any sense."  The defendant argues that the prosecutor "improperly invited the jury to resort to speculation."  While "[a] prosecutor may not misstate evidence or refer to facts not in evidence in a closing argument," Commonwealth v. Goddard, 476 Mass. 443, 449 (2017), he or she "may properly attack the credibility of witnesses," Commonwealth v. Donovan, 422 Mass. 349, 357 (1996).  Viewed in the context in which the prosecutor made his remarks, Commonwealth v. Valentin, 474 Mass. 301, 309 (2016), he properly attacked the credibility of a witness, here the defendant, see Commonwealth v. Copeland, 481 Mass. 255, 264 (2019) (not improper for prosecutor to state during closing argument that "one thing is for sure about whatever happened . . . , there's a lot of questions about it," and "[m]aybe something happened, maybe it didn't").

defendant did not act in self-defense. Where the defendant has sufficiently raised the issue of self-defense, the Commonwealth carries the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. Commonwealth v. King, 460 Mass. 80, 83 (2011). The defendant argues that "there was insufficient evidence to prove beyond a reasonable doubt the elements of the charged crimes because the Commonwealth failed to present any evidence that [the defendant] did not act in self-defense" as "there was no competent evidence from which the jury could draw the necessary inferences" that she had not acted in self-defense. The Commonwealth counters that the evidence was sufficient "to prove the [d]efendant hit and assaulted [the victim] without justification," and that the jury were free to discredit the defendant's self-defense claim. Viewing the evidence in the light most favorable to the Commonwealth, we hold that the jury could have found that the defendant did not act in self-defense on the assault and battery of a family member charge or on the assault by means of a dangerous weapon charge. See Commonwealth v. Latimore, 378 Mass. 671, 677-678 (1979).

To satisfy its burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, the Commonwealth must establish that at least one of the following factors did not exist: (1) the defendant had a reasonable concern for her

personal safety; (2) she used all reasonable means to avoid physical combat; and (3) "the degree of force used was reasonable in the circumstances, with proportionality being the touchstone for assessing reasonableness." King, 460 Mass. at 83, quoting Commonwealth v. Franchino, 61 Mass. App. Ct. 367, 368-369 (2004). Where deadly force is at issue, the defendant must have had an actual and reasonable belief of "imminent danger of death or serious bodily harm, from which [she] could save [herself] only by using deadly force" (citation omitted). Commonwealth v. Pike, 428 Mass. 393, 396 (1998).

After the Commonwealth rested its case, the defendant testified in her defense and, in doing so, raised the issue of self-defense; the judge then instructed the jury on self-defense. The defendant testified that the victim held her down on the floor, took and broke her vaporizer, and "smashed into the mirror,"[17] which caused glass shards from the mirror to fall on the defendant and the victim. She testified that while the victim pinned her to the ground, she could not move anything other than her head, so she bit him and used her "head to hit his nose, or face, or face in general to get off of [her]," and that she was "pretty sure" this gave him a nosebleed. She also testified that the victim "took [her] phone and smashed it

_____

[17] She testified on cross-examination that the mirror broke when the victim threw her vaporizer at it.

across the bathroom sink so [she] couldn't call anyone." She further testified that she went into the bathroom and locked the door, that the victim forced his way in, and that she then left the bathroom and grabbed a knife from the kitchen, which the victim took from her.

The defendant testified that she went to the hospital after being released from custody. Her medical records from her visit to the hospital were admitted, and a photograph, which she testified was taken four days after the incident and which depicted a bruise on her head, above her eyebrow, also was admitted. She testified that she received the bruise from the victim hitting her in the head with his arm and hand.

The jury were free to reject the defendant's testimony and instead credit the evidence presented by the Commonwealth. See Commonwealth v. Fluker, 377 Mass. 123, 128-129 (1979). The Commonwealth presented sufficient evidence, which included the victim's injuries, his statements he made over the telephone to his mother, and the police officers' testimony that they did not observe any marks or other injuries on the defendant during her arrest, to allow a reasonable jury to conclude that the defendant did not act in self-defense. The jury here could have also credited the various statements made over the course of the incident, including the victim's statement, "She tried to kill me. She pulled out a knife," and the neighbors' testimony that

the defendant stated, "I'm going to kill you, and I want you dead" and "I'm gonna F'ing kill you."  Given the evidence presented through the Commonwealth's witnesses, as well as the evidence of the victim's injuries, the Commonwealth presented sufficient evidence for the jury to find beyond a reasonable doubt that the defendant did not act in self-defense.  See King, 460 Mass. at 83.

5.  Defendant's due process right to a fair trial.  Moreover, contrary to the defendant's argument, the defendant received a fair trial.  The defendant argues that the "preserved and unpreserved errors combined to deny [her] a fair trial."  As discussed supra, the one error during the trial was the improper cross-examination, which although error, did not create a substantial risk of a miscarriage of justice.

6.  Third-party restitution.  The final issue is whether a trial judge may order a defendant to pay restitution to a third party and, if so, whether the order in the present case satisfied the causation requirement.  The defendant argues that she "should be reimbursed the restitution she was ordered to pay to the complainant's mother, a nonvictim, for losses the mother voluntarily incurred."  She further argues that even if a trial judge may order a defendant to pay restitution to a third party, the order here was improper because the victim's mother's economic loss was not sufficiently connected to the defendant's

offense.  The Commonwealth counters that "courts are not limited to ordering restitution only to named victims, and as the expenses were related to the offense and reasonably foreseeable, the court's restitution order was proper."  We hold that the judge properly ordered the defendant to pay restitution to the victim's mother.

The power of a judge to order restitution in a criminal case "derives from the judge's power to order conditions of probation under G. L. c. 276, §§ 87, 87A, and G. L. c. 279, § 1."  Commonwealth v. McIntyre, 436 Mass. 829, 833 (2002).  Cf. G. L. c. 258B, §§ 1, 3 (o) (victim has right to seek restitution, and defining "victim" as "any natural person who suffers direct or threatened physical, emotional, or financial harm as the result of the commission or attempted commission of a crime").  A judge's power to order a defendant to pay restitution is "unquestionable" and "free of any [statutory] limitation on a judge's authority," and "afford[s] judges significant latitude in imposing such conditions" (quotations and citations omitted).  Commonwealth v. Denehy, 466 Mass. 723, 737 (2014).  See McIntyre, supra, quoting Commonwealth v. Nawn, 394 Mass. 1, 6 (1985) ("There is no question that restitution is an appropriate consideration in a criminal sentencing").  We review restitution orders for an abuse of discretion or an error of law.  See McIntyre, supra at 836.

In the present case, after a hearing on the issue of restitution, the judge ordered the defendant to pay $232.37 in restitution to the victim's mother.[18]  As the victim's mother testified at the restitution hearing, the $232.37 covered her payment for her son's two psychiatrist visits that took place after the incident, the removal of the staples from his head that were placed there in the hospital after the incident, and his prescription medicine connected to the present incident. The mother provided receipts, which were entered in evidence, documenting these expenses.  However, the differentiating factor from a more typical restitution order is that here the judge ordered the defendant to pay restitution to the victim's mother, rather than to the victim himself.  Although a third party (who is not also a victim of the crime, or a family member of a minor victim) may not have the "right" to seek restitution under G. L. c. 258B, § 3 (o), we hold that a judge has the power to order a defendant to pay restitution to such a third party.  See G. L. c. 258B, §§ 1, 3 (o); Denehy, 466 Mass. at 737 (judge has "significant latitude" to order restitution [citation omitted]).

---

[18] The judge declined to include in the amount of restitution other expenses that the mother incurred.  The victim's mother testified that she incurred expenses for "supplies to try to fix the damage that happened the night of the attack" and a one hundred dollar payment she made toward the apartment's electric bill.  The judge ruled that the electric bill and hardware supplies were not related to the criminal offense.

While the defendant disputes the validity of a restitution order to a third party, given the circumstances of this case, with the defendant causing the victim to need medical care and the victim's mother paying for that care, it was within the judge's discretion to order restitution to the victim's mother because it was "primarily designed to meet . . . the goals of sentencing and of probation."  Commonwealth v. Power, 420 Mass. 410, 414 (1995), cert. denied, 516 U.S. 1042 (1996).  We note that third-party restitution may not always be appropriate, but in the facts of the present case, where the mother paid for her son's medically related care, incurred as a direct result of the defendant's actions, the judge properly ordered it.  See McIntyre, 436 Mass. at 833 ("restitution best serves penal objectives when it bears a proper relationship to the crime of conviction, both in kind and proportion").

Moreover, the restitution order met the causation requirement in the present case.  See id. at 834-835, quoting Glaubius v. State, 688 So. 2d 913, 915 (Fla. 1997) (scope of restitution limited to "loss or damage [that] is causally connected to the offense and bears a significant relationship to the offense").  See also Denehy, 466 Mass. at 739 (test adopted in McIntyre "is a broad test that requires a holistic assessment of the facts surrounding the crime, not merely those facts establishing the elements of the crime").  Where the victim's

mother presented evidence of expenses she paid for the victim's medical care as a direct result of the defendant's actions, the expenses incurred were "causally connected to the offense and [bore] a significant relationship to the offense." McIntyre, 436 Mass. at 834-835, quoting Glaubius, 688 So. 2d at 915. In addition, even though the victim was not a minor, it also was reasonably foreseeable that a mother would pay her twenty-four year old son's medical and medically related expenses. For these reasons, the restitution order was proper. See McIntyre, supra at 836.

So ordered.

LOWY, J. (concurring). I agree with the court that the defendant's convictions should be affirmed and that aspects of the prosecutor's cross-examination of the defendant were improper. I also agree that the improper cross-examination did not create a substantial risk of a miscarriage of justice. I write separately to emphasize a point that was made in the court's opinion. When impeaching a witness, interrogators need not be able to prove the contrary of a denial of their question with admissible evidence as a foundation for their inquiry. In other words, we do not require that the party impeaching the witness have support for the question through otherwise admissible evidence. See Commonwealth v. White, 367 Mass. 280, 283-284 (1975) (judge did not err in permitting prosecutor to ask questions based on prosecutor's pretrial interview with witness even though prosecutor could only have introduced admissible evidence of that interview by withdrawing from case and becoming witness); Mass. G. Evid. § 611(b) & note (2020). Rather, counsel (or a pro se litigant) must have a reasonable and good faith basis to ask the question, and the question must be otherwise permissible. See Commonwealth v. Johnston, 467 Mass. 674, 699 (2014); Commonwealth v. Hart, 455 Mass. 230, 240 (2009) (we prevent attorneys from "pursu[ing] a line of questioning" for which they have no "good faith basis to believe

that" the witness's answers will "prove the matters to which the line refers" [citation omitted]).